**SIMON PROPERTY GROUP (TEXAS) L.P. and Dillard Department Stores, Inc., Appellants,**

v.

**The MAY DEPARTMENT STORES COMPANY, Appellee.**

**No. 13–96–550–CV.**

Court of Appeals of Texas, Corpus Christi.

Feb. 20, 1997.

Rehearing Overruled April 17, 1997.

John P. DeGeeter, Lawrence J. Fossi, Houston, Edmundo O. Ramirez, Ellis, Koeneke & Ramirez, McAllen, H. Robert Powell, Deron Ray Dacus, Austin, Roel Flores, McAllen, James A. Reeder, Jr., Vinson & Elkins, Houston, Jorge C. Rangel, Rangel & Chriss, Corpus Christi, Cynthia G. Gutierrez, Ellis, Koeneke & Ramirez, McAllen, Michael S. Truesdale, Hughes & Luce, Austin, Gilberto Hinojosa, Magallanes, Sokat & Hinojosa, Brownsville, J.A. Canales, Canales & Simonson, P.C., Corpus Christi, Nancy M. Simonson, Canales & Simonson, Corpus Christi, for Appellants.

Robert L. Galligan, Forrest L. Jones, Jones, Galligan, Key & Lozano, Weslaco, Ramon Garcia, Edinburg, Neil E. Norquest, Chris A. Brisack, Norquest & Brisack, McAllen, Stephen J. Horace, Mary L. Frontczak, Office of Legal Counsel of the May Dept. Stores Co., St. Louis, MO, for Appellee.

Before DORSEY, CHAVEZ and RODRIGUEZ, JJ.

## OPINION

CHAVEZ, Justice.

This is an appeal of the district court's denial of a temporary injunction to halt the construction of a new Foley's department store in McAllen, Texas. Among their respective points of error, appellees, Dillard Department Stores, Inc. and Dillard Texas Operating Limited Partnership (collectively "Dillard"), and Simon Property Group (Texas), L.P. ("Simon") argue that the trial court abused its discretion in failing to enjoin The May Department Stores Company ("May") from continuing the proposed addition to La Plaza Mall ("the mall") of a new Foley's store. We affirm the trial court's denial of injunctive relief.

### Standard of review

■ Our review of an interlocutory order denying injunctive relief is strictly limited to determination of whether there has been a clear abuse of discretion by the trial court in denying the interlocutory order. *Davis v. Huey*, 571 S.W.2d 859, 861–62 (Tex.1978); *State v. Cook United, Inc.*, 469 S.W.2d 709, 711 (Tex.1971). Accordingly, the merits of the underlying case are not presented for review.

Applying this standard, we consider (1) whether the trial court reasonably could have reached only one decision,[1] and (2) whether the trial court's decision was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.[2]

### History of La Plaza dispute

May, the parent entity of Foley's, is one of the largest department store operators in the United States. Simon is the mall's developer and Dillard is a competitor of May. Simon filed a declaratory judgment action, naming

---

1. *See Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992).

2. *See Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917–18 (Tex.1985).

Dillard and May as defendants, seeking the construction of two apparently conflicting real estate easement and operation agreements [3] ("REAs"), and related supplemental agreements.[4] The REAs central to this case establish correlative rights at the mall among particular "anchor" retailers, including Dillard and May, and the mall's developer, Simon. At issue is May's desire to replace the mall's first and oldest anchor store with a new, much larger Foley's store, which Dillard opposes.

In the early 1970s, the Jones family conveyed in fee a large tract of land in McAllen, Texas to a Simon affiliate for the purpose of developing a regional shopping center, later to be named "La Plaza Mall." On July 13, 1973, Simon reconveyed a much smaller tract of the mall site in fee to a Jones affiliate, to construct and operate the mall's first anchor department store—a luxury boutique named "Jones & Jones." [5]

On the same date as Simon's reconveyance to Jones, Simon and Jones entered into a Reciprocal Operating and Easement Agreement ("Jones REA") which would govern the relationship between Simon and Jones at the mall. The agreement was filed and recorded in the real property records of Hidalgo County, Texas, where the real property is situated. The Jones REA contemplated that Jones, J.C. Penney and a third, unidentified department store would anchor the mall. In accordance with the specifications of the Jones REA, Jones proceeded to construct a store consisting of one level, a mezzanine and a penthouse. The Jones store contained approximately sixty thousand square feet of floor space.

Among other things, the Jones REA provides:

Section 7.01. Developer [Simon] and Operator [Jones] agree that there shall be no verticle [sic] or lateral additions to the buildings ... except that, in the event that the Shopping Center Site shall be hereafter expanded by the *acquisition of contiguous territory and area*, parties agree to negotiate in good faith for the respective rights of expansion of their respective facilities [emphasis added]; ...

Section 8.01. At its own expense the Operator [Jones] may, at any time ..., make any additions, alterations, improvements or replacements, interior or exterior, structural and nonstructural, ordinary as well as extraordinary, in, on, or of the Floor Area of the Operator Site in whole or in part, which Operator [Jones] in its sole discretion, may deem necessary or desirable, provided, however, that any such exterior alteration or improvement is consistent with the Site Plan and shall not ... (iii) for the first 30 years after the Operator Building is first opened ... include demolition of the Operator Building except for the purpose of promptly replacing it with another building complying with [the Jones REA].

Section 10.03. (a) For so long as the Developer [Simon] shall operate an enclosed mall regional shopping center, Operator [Jones] shall not, without the consent of the Developer: ... (ix) add any building or structure to the Operator Site, or reduce the area of the Common Area on the Operator Site, except as to Expansion and as may be expressly otherwise permitted in this Agreement. Nothing contained hereinabove in this Section 10.03 shall be deemed to prohibit Operator from exercising any of the rights granted it elsewhere in this Agreement ...

Section 12.03....

(d) In respect of any matter which, under this Agreement, Operator [Jones] may do or perform with respect to its Site only with the consent or approval of Developer

---

**3.** REAs are a common tool in the shopping center industry for maintaining a unified scheme of development, use and operation. Parties to an REA will typically be anchor department stores and the shopping center developer.

**4.** Supplements to REAs, known as "tie-in" agreements, are common in the shopping center industry. Their aim is to harmonize potentially disparate REA provisions. Additionally, a tie-in

agreement will serve as a formal agreement to share parking, ingress and egress rights among signatories.

**5.** For clarity herein, all Jones entities will be collectively referred to as "Jones," and all Simon entities will be collectively referred to as "Simon."

[Simon], no such consent or approval shall be deemed to be required if the Developer is suffering or permitting the owner of any other site, with whom the Developer has executed a Reciprocal Operating Agreement, to do such matter with respect to their site.

Simon brought Dillard to the mall as its third anchor department store, and conveyed a portion of the mall site to a Dillard affiliate in fee.[6] A Construction, Operation and Reciprocal Easement Agreement ("Dillard REA") was entered into by Simon and Dillard in 1977. The Dillard REA, to which Jones was not a signatory, provides:

*Definitions*

1. *"Party"*—each separate principal business entity now or hereafter making, entering into and signing this Operating Agreement, . . .

*Paragraph*

4.1 . . .

(2) No Party shall expand any Building, or construct any additional building, . . . without prior written approval of each other party.

In late December 1977, responsive to the execution of the Dillard REA, Dillard, Simon and Jones entered into a Supplement to Reciprocal Easement and Operation Agreements ("First Supplement"). The First Supplement provides:

3. It is hereby understood and agreed that, notwithstanding the respective dates of execution or recording of the Jones REA and the Dillard REA, said Jones REA and the Dillard REA shall be deemed to be *concurrent* and *coordinate*, and neither the Jones REA nor the Dillard REA shall have any priority over the other [emphasis added].

The First Supplement remained the effective instrument among Simon, Jones and Dillard until 1981, when Sears, Roebuck & Co ("Sears") came to the mall and negotiated its own REA with Simon, necessitating a new tie-in agreement.[7]

In September of 1981, Simon, Jones, Dillard and Sears signed the Amendment and Second Supplement to Reciprocal Easement and Operating Agreements ("Second Supplement"). The Second Supplement provides:

6. It is hereby understood and agreed that, notwithstanding the respective dates of execution and recording of the REAs, said REAs shall be deemed to be *concurrent* and *coordinate*, and none shall have any priority over the others; PROVIDED, HOWEVER, that this provision shall not in any manner whatsoever affect the terms, provisions and conditions of the operating covenants contained in said REAs [emphasis added].

Several years passed, and May determined to enter the growing Rio Grande Valley market with a store at La Plaza Mall. Simon conceded that it was quite interested in adding a May store to the mall, and Simon sought to acquire a trailer park adjacent to the mall in order to facilitate expansion. When Simon was unable to close a deal on the trailer park realty, Simon consented to an attempt by May to do the same. May convinced the trailer park owner to sell her property in the early part of 1995 and the closing occurred in late-June 1995.

May announced its plans to construct a new Foley's store on the trailer park site in a press release dated February 1, 1995. Simon and May commenced preliminary negotiations concerning the new Foley's venture. The record indicates that Simon may have orally promised to accommodate May insofar as mall enlargements were desired by the retailer. The record also indicates that Dillard, upon learning of this development, requested Simon to build a fence physically separating the mall from May's trailer park tract.

May then altered its strategy for establishing a beachhead at La Plaza Mall. May acquired the Jones store in late April 1996, becoming owner of an anchor store at La Plaza Mall and successor-in-interest to the

---

6. For clarity, all Dillard entities are collectively referred to herein as "Dillard."

7. Sears is not a party to this lawsuit and apparently has expressed no opposition to the Foley's store project.

Jones REA.[8] May announced its intentions to raze the Jones store and to construct a new Foley's store, containing approximately one hundred eighty thousand square feet of floor space. The proposed store and associated parking spaces would occupy the former Jones store site as well as the former trailer park.

Almost immediately after acquiring the Jones store, May sought to negotiate with Simon concerning its new plans. May desired acquiescence by Simon to its planned replacement for the Jones store. Initial consultations between Simon's executives and May were agreed, at least on a limited basis, to be confidential (*i.e.*, not revealed to Dillard).

Executives of Simon and May consulted numerous times concerning plans forwarded to Simon by May for the proposed Foley's store at the mall. In fact, Simon developed a proposed blueprint for the mall containing the new Foley's, later asking May to rotate the layout of the original proposal, and to reconfigure the proposed store's loading docks. May and Simon appeared to be rapidly progressing toward a mutually agreeable store plan.

Despite developer-operator consultations over several weeks, Simon eventually withdrew its imprimatur from the new Foley's project. Dillard, however, was unequivocal in its opposition to the new Foley's from the time it learned of May's plans with respect to the Jones store. On July 5, 1996, counsel for Dillard, referring to the consent provision of the Dillard REA, made the following representation in correspondence to Simon:

> With regard to the proposed new Foley's store, we don't feel that such an expansion is appropriate or in the best interests of this center [*i.e.*, La Plaza Mall]. The REA between Developer [Simon] and Dillard expressly prohibits expansion ... without our consent. For the reasons set forth herein, Dillard Texas hereby declines to

consent to the proposed expansion of the Jones building.

On August 8, 1996, Simon expressly refused its consent to the new Foley's project, advising that "if you [May] proceed with the proposed alterations at La Plaza without our consent, you act at your own peril and in breach of our agreements."[9]

Notwithstanding the opposition of Simon and Dillard, May proceeded to liquidate the Jones store's inventory and subsequently erected a construction fence around the store's perimeter. May began demolition activities, signifying its resolution to proceed with new construction plans at the mall. Dillard, refusing to grant its consent to the new Foley's store, appealed to Simon for a solution. Simon instructed its mall manager to refuse cooperation in the Foley's project.

On August 15, 1996, Simon filed the instant lawsuit. Apparently, both Simon and Dillard unilaterally assumed that May would halt construction until trial of the declaratory action. May, however, had other plans.

May had scheduled its new department store at La Plaza Mall to open in mid-summer 1997, and testimony indicated that May's tight construction schedule would make construction delays costly. Thus, May continued its demolition and construction operations even after Simon filed suit, prompting Dillard to seek an injunction of May's activities at the mall related to the proposed Foley's store. Soon thereafter, Simon also sought an injunction of May's demolition and construction work.

Essentially, May contends that it has a right, unaffected by the Dillard REA, to construct the proposed store based on, *inter alia*, Sections 7.01, 8.01, 10.03 and 12.03 of the Jones REA. May's contention is that its expansion and development rights inhere irrespective of the Dillard REA, to which it is not a party. May urges that, since it has acquired "contiguous territory and area," its only duty is to negotiate with Simon in good

8. The record indicates that the Jones store was a "high-end" luxury boutique, and not particularly a competitor of Dillard at the mall. The proposed Foley's store, however, would target essentially the same customers as Dillard.

9. It may be instructive to note that Dillard's president and chief executive officer is a member of Simon's board of directors.

faith pursuant to Section 7.01 of the Jones REA.

Dillard, on the other hand, contends that it has the right to unilaterally exercise veto power over the Foley's project, based on paragraph 4.1 of the Dillard REA. Dillard argues that the consent rights conferred by the Dillard REA apply to May through the Second Supplement, to which May's predecessor-in-interest was a signatory.

At the heart of this impasse lies the Second Supplement, which purports to render the Jones REA and the Dillard REA "concurrent" and "coordinate."

The temporary injunction determination in this case was a lengthy affair. Simon, Dillard and May all submitted briefs to the trial court in support of their respective positions. The temporary injunction hearing consumed several days, with live testimony received from at least thirteen witnesses. The trial court denied the requested injunctions.

### Temporary injunction criteria

■ At the hearing for a temporary injunction, the only question before the trial court is whether the applicants are entitled to an order to preserve the *status quo* pending trial on the merits. *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993). To qualify for such an order, the movants are required to prove (1) a probable right of recovery, (2) that imminent, irreparable harm will occur in the interim should the injunction be denied, and (3) that no adequate remedy at law exists. *City of San Antonio v. Rankin*, 905 S.W.2d 427, 430 (Tex.App.—San Antonio 1995, no writ). The rules applicable to injunctions pending trial are directed at, *inter alia*, preventing the risk of injustice occasioned when a party would otherwise be denied a course of conduct that he may have a legal right to pursue. *See Johnson v. City of Austin*, 674 S.W.2d 894, 899 (Tex.App.—Austin 1984, no writ).

■ Although some conditions may warrant the issuance of injunctive relief absent the nonexistence of an adequate remedy at law,[10] establishment of a probable right to recovery at trial remains a prerequisite to injunctive relief. *See Walling*, 863 S.W.2d at

58 (Tex.1993); *Valenzuela v. Aquino*, 763 S.W.2d 43, 44 (Tex.App.—Corpus Christi 1988, no writ). Appellants have fallen short of establishing a probable right of recovery for reasons set forth below.

■ A further barrier to recovery by appellants is the difficulty in precisely ascertaining the *status quo* in this case. The *status quo* to be preserved by a temporary injunction is the last, actual, peaceable, non-contested status that preceded the controversy. *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex.1975). In this case, it appears that the controversy subject to litigation developed upon May's liquidation and demolition of the Jones store. Thus, the last, actual, peaceable, noncontested status that preceded the present controversy was the operation of a department store by the fee owner of the Jones site. By seeking to replace its store, as apparently permissible under Section 8.01 of the Jones REA, May's activities are arguably in the nature of maintaining the *status quo*.

### Construction of REAs and Tie–In Agreements

Since the Jones REA and the Dillard REA are facially inconsistent, the logical point of departure for harmonizing these documents would be the Second Supplement. The Second Supplement deems the Jones REA and the Dillard REA to be "concurrent" and "coordinate." What precisely do these terms mean?

BLACK'S LAW DICTIONARY defines "concurrent" as follows:

> Running together; having the same authority; acting in conjunction; agreeing in the same act or opinion; pursuit of the same course; contributing to the same event; contemporaneous. Co-operating, accompanying, cojoined, associated, concomitant, joint and equal, existing together, and operation on the same subject. United in agreement....

BLACK'S LAW DICTIONARY 291 (6th Ed.1990). Texas cases are not helpful in elucidating a precise application for this term.

---

**10.** *See, e.g.,* TEX.CIV.PRAC. & REM.CODE ANN. § 65.011(5) (Vernon 1986).

As to the term "coordinate," Black's Law Dictionary supplies the following definition:

Equal, of the same order, rank, degree or importance; not subordinate. *Empire Ins. Co. of Texas v. Cooper*, [138 S.W.2d 159, 164 (Tex.Civ.App.—Amarillo 1940, writ dism'd).] ...

BLACK'S LAW DICTIONARY 334 (6th Ed.1990). Thus, the leading definition of this term derives from a Texas case, albeit factually dissimilar from the present case.

Applying the authoritative legal definitions of the terms "concurrent" and "coordinate" to the Second Supplement, we remain at a loss to ascertain the parties' intended rights as set forth in Paragraph 6 of that agreement. The express terms of the Second Supplement are unavailing and we therefore rely on Texas law for guidance.

 Covenants restricting the free use of land are not favored by the courts, but when they are confined to a lawful purpose and are *clearly worded*, they will be enforced. *Wilmoth v. Wilcox*, 734 S.W.2d 656, 657 (Tex.1987). Doubts are to be resolved in favor of free and unrestricted use of premises. *Id.* Restrictions giving rise to ambiguity or substantial doubt as to interpretation should be resolved in a manner that favors "free use of land." *See Baker v. Brackeen*, 354 S.W.2d 660, 663 (Tex.Civ.App.—Amarillo 1962, no writ). The covenant under review is contained by the Dillard REA, which Dillard and Simon seek to apply to May through the Second Supplement.

 The Second Supplement establishes that the Jones REA and the Dillard REA are to be considered "concurrent" and "coordinate." We regard this as a requirement of parity or equality. Nevertheless, it seems clear that May, under the Jones REA, has expansion rights independent of the consent provisions of the Dillard REA. The varying interpretations of the Jones REA, the Dillard REA and the Second Supplement have engendered the present deadlock. The Second Supplement, therefore, fails to surmount the *Wilmoth* requisite for enforcement.

Appellants urge us to consider Chapter 202 of the TEXAS PROPERTY CODE, which was added by the legislature in 1987. *See* Act of June 18, 1987, 70th Leg., R.S. ch. 712, § 1, 1987 Tex.Gen.Laws 5171. Section 202.003(a), TEXAS PROPERTY CODE, provides that "a restrictive covenant shall be liberally construed to give effect to its purposes and intent." TEX.PROP.CODE ANN. § 202.003 (Vernon 1995). The existence of TEXAS PROPERTY CODE, Chapter 202, does not preclude consideration of longstanding equitable principles favoring free and unrestricted use of land. *See, e.g., Ashcreek Homeowner's Ass'n, Inc. v. Smith*, 902 S.W.2d 586, 589 (Tex.App.—Houston [1st Dist.] 1995, no writ). We therefore consider statutory and common law bases for covenant interpretation.

The common law of Texas is clear: all doubts must be resolved in favor of the free and unrestricted use of realty. *Wilmoth*, 734 S.W.2d at 657; *Southampton Civic Club v. Couch*, 159 Tex. 464, 322 S.W.2d 516, 518 (1958); *see also, MacDonald v. Painter*, 441 S.W.2d 179, 183 (Tex.1969). Applying this equitable principle, doubts must be resolved in favor of May.

### Section 7.01 of the Jones REA

Having determined the deference required by the Second Supplement (and, by extension, the Dillard REA), we now examine May's compliance with the Jones REA. Section 7.01 of the Jones REA provides:

Section 7.01. Developer [Simon] and Operator [Jones] agree that there shall be no verticle [sic] or lateral additions to the buildings ... except that, [1] in the event that the Shopping Center Site shall be hereafter *expanded by the acquisition of contiguous territory and area*, [2] parties agree to *negotiate in good faith* for the respective rights of expansion of their respective facilities [emphasis added]; ...

Therefore, we ask: Did May have the right to expand the Shopping Center Site by the acquisition of contiguous territory and area?

 The trailer park tract abuts the mall and is clearly "contiguous territory and area" with respect to La Plaza Mall and specifically the site re-conveyed in fee to Jones in 1973. The trailer park tract was acquired by May in late-June 1995. May acquired the Jones store in April 1996. Appellants argue that the timing of May's acquisitions precludes its

satisfaction of Section 7.01 of the Jones REA. We believe that appellants call attention to a distinction without a difference. Were May capable of acquiring "contiguous territory and area" within the contemplation of Section 7.01 of the Jones REA, the timing of May's acquisitions would be irrelevant, as all doubts must be resolved in favor of the free and unrestricted use of realty. *See Wilmoth*, 734 S.W.2d at 657; *MacDonald*, 441 S.W.2d at 183; *Southampton*, 322 S.W.2d at 518.

The same rule controls the issue of whether the Jones REA, Section 7.01, contemplates that May, as successor-in interest to Jones, may "acquire" adjacent realty. The Jones REA is fatally ambiguous as to precisely who it intends to be the acquiring party, and we must assume that both parties to the Jones REA received the right of territorial expansion.

The record indicates that, within days of acquiring the Jones store, May requested and received several high-level meetings with Simon executives, for the purpose of discussing the proposed Foley's store. At the outset, May requested confidentially for its consultations with Simon's executives, indicating its desire to shield the formative stages of operator-developer negotiations from Dillard, a direct competitor of May. The record indicates that Simon's executives were at least hesitantly compliant with May's confidentiality request. We do not consider May's confidentiality request to be evidentiary of bad faith *vis-a-vis* Simon, the party to which it owed the duty to negotiate in good faith.

Simon was initially quite interested in the project, as the proposed store would significantly enhance the value of the mall. May apparently presented a proposed store plan to Simon, and Simon responded by suggesting several plan alterations to May.

Simon asked May to investigate the possibility of rotating the "footprint" of the proposed store by ninety degrees, as well as reconfiguring the loading docks for the Foley's store. In fact, Simon produced a blueprint "development plan," dated June 13, 1996, depicting the proposed Foley's store with 180,000 square feet of floor space. The record is replete with correspondence exchanged by May and Simon as negotiations

progressed. Some letters sent to May executives by Simon encapsulate Simon's explicit contention that Simon had negotiated with May in "good faith."

Based on the course of dealing between Simon and May concerning the proposed Foley's store, it appears that *both* parties were, at least initially, faithful to their obligations under Section 7.01 of the Jones REA. Therefore, those parties have negotiated in good faith. The Jones REA required Simon and May to "negotiate in good faith," but is silent as to situations, as here, where good faith negotiations may result in deadlock. We determine that May has complied with the "good faith negotiation" requirement of section 7.01 of the Jones REA.

### Section 8.01 of the Jones REA

Section 8.01 of the Jones REA provides:

At its own expense the Operator [Jones] may, at any time . . ., make any additions, alterations, improvements or replacements, interior or exterior, structural and non-structural, ordinary as well as extraordinary, in, on, or of the Floor Area of the Operator Site in whole or in part, which Operator [Jones] in its sole discretion, may deem necessary or desirable, provided, however, that any such exterior alteration or improvement is consistent with the Site Plan and shall not (i) change the location of the entrances of the Operator Building on the Covered Mall side thereof or (ii) render the exterior of the Operator Building inharmonious with the general exterior of the Shopping Center or (iii) for the first 30 years after the Operator Building is first opened . . . include demolition of the Operator Building except for the purpose of promptly replacing it with another building complying with Section 1.01 and subject to the provisions of Section 10.01 as to size hereof and provided, further, that any expansion complies with Section 7.01.

Thus, we consider whether the proposed Foley's store comports with Section 8.01 of the Jones REA.

The development plans prepared by Simon indicate that the proposed Foley's store will preserve the former Jones store's entrance to the covered mall on the southern

end of the department store. We consider it to clearly be a debatable question as to whether the exterior of the proposed Foley's store would be "inharmonious" with the exterior of the rest of the mall. The contract does not define "inharmonious," and we assume that the trial judge may have validly exercised his discretion to determine this inquiry in favor of May.

As May promptly sought to replace the Jones store, we only inquire as to whether the proposed Foley's store violates Sections 1.01 or 7.01 of the Jones REA, or Section 10.01 as it applies to expansion. Section 1.01 essentially establishes the dimensions of the original Jones store, and compliance therewith is inapposite to our analysis. As to Section 7.01, we have already determined that May has raised meritorious arguments regarding its compliance therewith. Section 10.01, in relevant part, provides that the department store contemplated by the Jones REA contain "at least 60,000 square feet of Floor Area." The proposed Foley's store contains 180,000 square feet of floor area.

Having initially surmounted the requirements of Section 10.03 of the Jones REA, May's plans are not thwarted thereby.

### Section 12.03(d) of the Jones REA

Section 12.03(d) of the Jones REA provides:

> In respect of any matter which, under this Agreement, Operator [Jones] may do or perform with respect to its Site only with the consent or approval of Developer [Simon], *no such consent or approval shall be deemed to be required if [1] the Developer is suffering or permitting the owner of any other site, [2] with whom the Developer has executed a Reciprocal Operating Agreement, [3] to do such matter with respect to their site* [emphasis added].

Thus, the proposed Foley's would not require Simon's consent under circumstances which we deem applicable to the instant facts.

■ The record indicates that, as early as 1994, Simon had developed and circulated among its anchor tenants a plan for general enlargement of the mall. The development plan, dated January 20, 1994, calls for enlargement of Dillard's store from 143,703 square feet (present size) to 213,000 square feet.[11] Subsequent development plans, including that of June 13, 1996, which contains a proposed Foley's store of 180,000 square feet, maintained the planned development of a new Dillard's store of 213,000 square feet. The proposed Dillard store is significantly larger than May's proposed store.

Dillard and Simon have executed an REA ("Dillard REA"). Therefore, May's interpretation of Section 12.03 of the Jones REA is persuasive insofar as Simon's requisite consent, if any, to May's expansion of the former Jones store may have been vitiated by Simon's consent to Dillard's expansion plans. Simon's withholding of consent to the Foley's project is without effect.

### Section 10.03 of the Jones REA

Section 10.03 of the Jones REA provides:

> (a) For so long as the Developer [Simon] shall operate an enclosed mall regional shopping center, Operator [Jones] shall not, *without the consent of the Developer:* ... (ix) add any building or structure to the Operator Site, or reduce the area of the Common Area on the Operator Site, except as to Expansion and as may be *expressly otherwise permitted* in this Agreement. Nothing contained hereinabove in this Section 10.03 shall be deemed to prohibit Operator from exercising any of the rights granted it elsewhere in this Agreement [emphasis added] ...

The foregoing provision essentially grants Simon a veto right as to May's plans, which is arguably meaningless in view of the expansions rights contained elsewhere in and/or expressly permitted by the Jones REA. Therefore, Section 10.03 is of no import in application of the Jones REA to the facts at hand.

### Application of appellate standard of review

■ Having explored the issues relevant to the injunction sought by Dillard and Simon, we determine whether the trial judge committed a clear abuse of discretion.

---

11. All "development plans" referred to herein were presumptively created by Simon or on its behalf, as they bear the developer's name at the head of the "project data" table.

Again, we consider (1) whether the trial court could reasonably have reached only one decision, and (2) whether the trial court's decision was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.

Our task is not to address the merits anew. Rather, we address the propriety of the trial court's denial of injunctive relief. The record contains an enormous volume of evidence and argument presented to the trial court by Simon, Dillard and May. Clearly, a substantial difference of opinion exists as to the proper construction to be given the various instruments underlying this suit. Difficult legal and factual determinations remain at the trial court level, and it would be extraordinary to divine precisely who would likely prevail at trial. As noted above, even the *status quo,* sought to be preserved by Dillard and Simon, escapes an easy characterization. The trial court's order denying relief does not warrant reversal.

All of appellants' points of error are overruled. The order of the trial court is AFFIRMED.