The CITY OF HOUSTON, Texas; Metropolitan Transit Authority of Harris County, Texas; And Sterling Construction Company d/b/a Texas Sterling Construction, Inc., Appellants,

v.

Rob TODD and Allan Vogel, Appellees.

No. 01–01–00123–CV.

Court of Appeals of Texas, Houston(1st Dist.).

March 8, 2001.

Order Denying Rehearing and Rehearing En Banc March 27, 2001.

---

were drafted in 1905.[2] The material facts in this case are undisputed. We are to construe the charter and statutory provisions as a matter of law, and then we are to apply the law to the undisputed facts.

This case is brought to us by way of an interlocutory appeal of a temporary injunction. Appellants, Houston Metropolitan Transit Authority (METRO), the City of Houston (the City), and Sterling Construction Company d/b/a Texas Sterling Construction, Inc. (Texas Sterling) appeal the trial court's order granting a temporary injunction that enjoins METRO and the City from proceeding with the construction of a commuter light rail project. Because we conclude the trial court erred, as a matter of law, in its construction of the relevant provisions, we reverse.

## FACTUAL BACKGROUND

The proposed light rail system, designed and developed by METRO, would operate in a street right-of-way of Main Street in Houston for approximately seven and a half miles. Construction of the project was scheduled to begin on February 1, 2001. Bidding on the project began in December 2000 and continued through January 2001. For bidding purposes, construction of the project was divided into five segments. Texas Sterling, a general contractor, was the recognized low-bidder for three of the segments.

Lee L. Kaplan, Houston, for Appellant.

W. Briscoe, Swan, Houston, R. Clayton Trotter, Allan E. Parker, San Antonio, for Appellee.

Judy K. Hatfield, Jonathan Day, Mayor, Day & Caldwell, Houston, for Cross–Appellant.

Panel consists of Chief Justice SCHNEIDER and Justices MIRABAL and NUCHIA.

## OPINION

MIRABAL, Justice.

It is our task in this case to construe (1) certain provisions of the Texas Transportation Code,[1] and (2) certain provisions of the Houston City Charter, many of which

## PROCEDURAL HISTORY

In September 1999, Rob Todd, a Houston City Council member, filed suit against METRO seeking injunctive relief on the basis that METRO had failed to obtain the permission of the city council before beginning the light rail project. METRO re-

---

1. Tex.Transp.Code Ann. Chapter 451 (Vernon 1999) (dealing with Metropolitan Rapid Transit Authorities).

2. Houston, Tex, City Charter (Act of 1905, as amended).

sponded that it would obtain the City's permission before undertaking the project.

By a vote of 11 to 4, the city council passed Ordinance 2000 1028 on November 21, 2000 (the same day it was introduced) that approved, authorized, and incorporated by reference a consent agreement between the City and METRO relating to the construction of the light rail system. *See* HOUSTON, TEX., ORDINANCE 2000–1028 (Nov. 21, 2000).

In December 2000, a petition for referendum on Ordinance 2000–1028 and the consent agreement was signed by approximately 1100 registered Houston voters. The petition stated that a vote of the citizens of Houston was required by article II, section 18 of Houston's City Charter. Among the signatories to the petition was Allan Vogel.

When the City refused to hold an election on the referendum, Vogel intervened in the pending lawsuit against METRO, and Todd supplemented his petition adding the City of Houston as a defendant. Texas Sterling also intervened in the suit. Todd and Vogel filed an amended petition on January 29, 2001 seeking (1) temporary and permanent injunctions against METRO and the City to enjoin them from taking any action to construct the light rail, (2) a writ of mandamus requiring that a referendum on Ordinance 2000–1028 be held, and (3) a declaratory judgment that the ordinance was void and that METRO could not use or occupy the streets of Houston without an election granting it that right.

Following an evidentiary hearing, the trial court signed a temporary injunction on February 2, 2001 enjoining the effectiveness of the ordinance and prohibiting the City from taking or allowing any further action relating to the ordinance or the consent agreement with METRO. The trial court set the bond for METRO at $1000 and for the City at $500.

In support of the temporary injunction, the trial court entered the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. Applicant Vogel is a resident and taxpayer of the City of Houston who signed a Petition for Referendum on City Ordinance 2000–1028. He is also a registered voter authorized to vote in City elections.

2. Applicant Todd is a resident of the City of Houston, a taxpayer, a registered voter, and a member of the Houston City Council....

3. The City Council passed Ordinance 2000–1028 and the City signed a Consent Agreement ... that allows its property to be altered by Metro to build a rail line from downtown Houston to the Astrodome.

4. A petition, titled "Petition for Referendum," containing more than 500 signatories of persons registered to vote in the City of Houston was filed with the City Secretary within 30 days of the signing of Ordinance 2000–1028 by Mayor Brown.

5. Defendants Metro and the City are proceeding to act under the Consent Agreement without holding an election on Ordinance 2000–1028.

6. Ordinance 2000–1028 was not read at three consecutive meetings before being passed by Council.

7. All findings of fact that are determined to be conclusions of law are so deemed.

## CONCLUSIONS OF LAW

1. Applicants Todd and Vogel have standing to bring this case.

2. Texas Transportation Code section 451.058(e) requires a mass transit authority, including Metro, to obtain the written permission of the City before altering or damaging City property. Section 451.058(e) does not preempt the provisions of the Charter of the City of Houston ..., including the requirements of Article II Sections 17 and 18.

3. The provisions of Article II Section 17 of the City Charter apply to Ordinance 2000–1028 and to the Consent Agreement between the City of Houston and the Houston Metropolitan Transit Authority.

4. The provisions of Article II Section 18 of the City Charter apply to Ordinance 2000–1028 and to the Consent Agreement between the City of Houston and the Houston Metropolitan Transit Authority.

5. Houston Ordinance 2000–1028 is not a duly authorized and valid ordinance adopted pursuant to the general police powers of the City to regulate its streets and to enter into contracts for the benefit of its citizens.

6. The Petition for an election signed by Applicant Vogel requires the City of Houston to order a referendum election before Ordinance 2000–1028 is effective or action is taken pursuant to it.

7. Houston Ordinance 2000–1028 establishes, grants, or conveys a use or privilege within the meaning of "franchise or special privilege" as that phrase is used in Charter Article VII Section 7.

8. Houston Ordinance 2000–1028 is not a duly authorized Ordinance in that it was passed finally on its date of introduction contrary to Charter Article VII Section 7, which prevents the passing of an ordinance as an emergency measure when the ordinance grants a franchise or special privilege.

9. Having weighed the equities, the Court concludes that the damage to applicants' right to vote, as well as other injuries that would be suffered if an injunction does not issue, exceed the damages, if any, that would be suffered by Metro and the City of Houston if the injunction does issue.

10. Intervenor Texas Sterling is not entitled to bond.

11. All conclusions of law that are determined to be findings of fact are so deemed.

On appeal, the City and METRO seek a reversal and a dissolution of the temporary injunction.

## STANDARD OF REVIEW

■■■ To be entitled to a temporary injunction from a trial court, an applicant must establish it has a probable right to the relief sought, and it will suffer a probable injury in the interim pending trial on the merits. *Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex.1993); *City of Friendswood v. Registered Nurse Care Home,* 965 S.W.2d 705, 707 (Tex.App.—Houston [1st Dist.] 1998, no pet.). The decision to grant or deny a temporary injunction lies within the sound discretion of the trial court, and we will not reverse that decision absent an abuse of discretion. *Walling,* 863 S.W.2d at 58; *CRC–Evans Pipeline Int'l, Inc. v. Myers,* 927 S.W.2d 259, 262 (Tex.App.—Houston [1st Dist.] 1996, no writ). An erroneous application of the law to undisputed facts will constitute an abuse of discretion. *City of Spring Valley v. Southwestern Bell Tel. Co.,* 484 S.W.2d 579, 581 (Tex.1972).

## DISCUSSION

In their issues one and two, respectively, METRO and the City contend that the trial court erred because it failed to properly apply the law. They argue (1) that the Houston City Charter provisions cited by the trial court in support of its decision to issue the temporary injunction are preempted by certain provisions of the Texas Transportation Code; and, (2) that regardless of preemption, the Houston City Charter provisions relied on by the trial court are not applicable to Ordinance 2000–1028.

### A. Preemption

 Home-rule cities, such as Houston, are given broad powers under the Texas Constitution and statutes. Tex. Const. art. XI, § 5; Tex.Loc.Gov't Code Ann. § 51.072 (Vernon 1999); *Jones v. City of Houston*, 907 S.W.2d 871, 876 (Tex. App.—Houston [1st Dist.] 1995, writ denied). A city ordinance or charter provision is presumed to be valid, and the courts have no authority to interfere unless it is unreasonable and arbitrary, amounting to a clear abuse of municipal discretion. *See City of Brookside Village v. Comeau*, 633 S.W.2d 790, 796 (Tex.1982); *Barnett v. City of Plainview*, 848 S.W.2d 334, 338 (Tex.App.—Amarillo 1993, no writ). However, an ordinance or charter provision of a home-rule city that attempts to regulate a subject matter preempted by a state statute is unenforceable to the extent it conflicts with the state statute. *Dallas Merchant's and Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 491 (Tex.1993). If the legislature decides to preempt a subject matter normally within the broad powers of a home-rule city, the legislature must do so with unmistakable clarity. *Id.* To the extent a home-rule city ordinance conflicts with a state statute on a preempted subject, the ordinance is not enforceable. *Id.* However, courts will not hold a state law and a city ordinance repugnant to each other if they can reach a reasonable construction leaving both in effect. *Id.* Simply because the legislature has enacted a law addressing a subject matter does not mean the legislature has completely preempted the subject matter. *Id.* As the following analysis shows, the relevant provisions of the Texas Transportation Code can be read in harmony with the relevant provisions of the Houston City Charter. Accordingly, the charter provisions do not conflict with the statutory provisions, and there is no preemption.

### B. Statutory Provisions, Consent Agreement, and City Charter Provisions

#### 1. Statutory Provisions

In May 1973, the Texas legislature passed legislation that authorized the creation of a rapid transit authority in Houston.[3] On August 12, 1978, the voters in the City of Houston voted in favor of the creation of METRO. *See City of Humble v. Metropolitan Transit Auth.*, 636 S.W.2d 484, 486 (Tex.App.—Austin 1982, writ ref'd, n.r.e.).

METRO is a "governmental unit," a "public political entity and corporate body [that] exercises public and essential government functions." [4] Pursuant to State law, METRO has the authority to construct, operate and maintain a transit au-

---

3. See Act of May 21, 1973, 63rd Leg. R.S., Ch. 141, 1973 Tex.Gen. Laws 302 (published at Tex.Rev.Civ.Stat.Ann. art 1118x (repealed 1995)) codified at Tex.Transp.Code Ann. §§ 451.001–.665 (Vernon 1999).

4. Tex.Transp.Code Ann. § 451.052(a),(c) (Vernon 1999).

thority system,[5] and for this purpose it has been granted the authority by the State:

-to use a public way;

-to relocate, reroute, or alter the construction of property, including roads, alleys, overpasses, underpasses, railroad tracks, bridges, cable lines, pipe lines, etc; and

-to acquire by eminent domain any interest in real property.[6]

If METRO relocates, reroutes, or alters the construction of a road or other property, METRO must pay the full cost and expense, as well as damages incurred by the owner of the property.[7] Unless METRO exercises its power of eminent domain, it may not begin altering or damaging the roads and other property of public entities like the City of Houston without first receiving written permission from the public entity.[8] If written permission is given, METRO and the public entity will naturally have agreed on the compensation for damages and costs, as well as on coordination of activities so as to minimize inconvenience and damage.

## 2. The Consent Agreement

The "Consent Agreement" between METRO and the City of Houston, which was approved by Ordinance No.2000–1028, specifically references the Texas Transportation Code provisions described above. The Consent Agreement and the Ordinance constitute the City's "written permission" for METRO to construct the light rail transit system on Main Street, and to operate and maintain the system. The Consent Agreement recognizes:

METRO desires that the Project be completed and commence service to the public as soon as is practicable and the City supports that endeavor and is willing to commit to a fast-track design and approval process for the project that will require close coordination and cooperation between the City and METRO;

. . . .

. . . [I]t is the intent of this Agreement to establish herein the rights and responsibilities, as well as the general guidelines and working relationships between METRO and the City so that the Project may be implemented within the City.

. . . .

This Agreement specifies (a) the consent granted by the City to METRO in connection with the Project, (b) the procedures that METRO and the City will follow in identifying, planning, designing, constructing, and operating the Project and, (c) the responsibilities of each party for such activities. The parties agree that each will cooperate and coordinate with the other in all activities covered by this Agreement and any supplemental agreements hereto.

. . . .

The Project will require daily interaction within various City departments including, at a minimum, coordination for utility relocations; design review; departmental approvals; permitting; design and construction coordination between the City and METRO; contingency and emergency planning; and traffic control. Each of these matters will require City staff to participate in the Project, to stay informed about each matter, and to represent the City's interest in the Project expeditiously with no delay in the Project's aggressive construction schedule.

5. *Id.* at § 451.056(a)(1) (Vernon 1999).

6. *Id.* at § 451.058(a),(c),(d).

7. *Id.* at § 451.058(d).

8. *Id.* at § 451.058(e).

The Consent Agreement specifically addresses project management; project design requirements, objectives and review; permits; facility impacts; responsibility for costs; traffic matters; signage; inspections; insurance; indemnification; and other matters. Notably, the Consent Agreement specifies:

### 2.3 No Charge for Consent

The use by METRO of streets and rights-of-way is a *public use* of the streets and rights-of-way that inures to the benefit of the people of the State; no charge or fee for such consent is authorized by law and none shall be charged or imposed.

(Emphasis added.) This language is consistent with the Texas Transportation Code. Under the Transportation Code, METRO had already been granted the right to use the City's streets, and therefore, the City has no authority to charge METRO a fee for the City's grant of permission. However, because the Transportation Code imposes on METRO the obligation to pay all costs of relocating, rerouting or altering the construction of streets, utility lines, and other property, as well as the obligation to pay the City for damages incurred, written permission providing for coordination of activities and services ensures that METRO proceeds in a manner that is consistent with the public health, safety, and welfare.[9]

### 3. The City Charter Provisions

■■■ The dispute in this case is over the manner in which the City gave its written permission for METRO to con-

struct the light rail project down Main Street. The City and METRO argue that the City properly passed Ordinance 2000-1028 pursuant to the following provisions of the Houston City Charter:

Article II, Section 2(b). General Powers.

Article II, Section 4. Street Powers.

Article VII-b, Section 3. Referendum.

Article V, Section 10. Number of signatures on Recall, Initiative and Referendum Petitions.

The trial court, on the other hand, concluded that the following provisions of the Houston City Charter control:

Article II, Section 17. Franchises.

Article II, Section 18. Referendum.

Article VII, Section 7. Passage of Ordinances After Introduction.

It is necessary for us to apply established rules of statutory construction to determine who is correct.

### a. *Rules of Statutory Construction*

■■■ Matters of statutory construction are questions of law for the court to decide. *Johnson v. City of Fort Worth*, 774 S.W.2d 653, 656 (Tex.1989). We construe a city charter provision according to the rules governing the interpretation of statutes generally. *Rossano v. Townsend*, 9 S.W.3d 357, 363 (Tex.App.—Houston [14th Dist.] 1999, no pet.). Our interpretation must be fair, rational, reasonable, and with a view accompanying the enacting body's intent and purpose. *Id.*

■■■ Our objective in construing a statute is to determine and give effect to

---

**9.** Paragraph 7.1 of the consent agreement reads:

The purpose of this Agreement is to enable METRO, with City assistance, to perform all tasks necessary to ensure the successful design and subsequent construction and operation of the Project while at the same time integrating the Project Facilities into existing City Facilities and Private Facilities in a manner that is consistent with the public health, safety, and welfare.

the intent of the lawmaking body. *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex.1998); *City of Houston v. Morua*, 982 S.W.2d 126, 129 (Tex.App.—Houston [1st Dist.] 1998, no pet.). In so doing, we look first to the plain and common meaning of the statute's words. *Liberty Mut. Ins.*, 966 S.W.2d at 484; *see also Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex.1999). We also construe the statute in the light of the entire body of law existing at the time of its enactment. *City of Ingleside v. Kneuper*, 768 S.W.2d 451, 454 (Tex.App.—Austin 1989, writ denied). Further, we consider the entire statute, not simply the disputed portions. *Bridgestone/Firestone, Inc. v. Glyn–Jones*, 878 S.W.2d 132, 133 (Tex.1994); *Berel v. HCA Health Servs. of Texas, Inc.*, 881 S.W.2d 21, 25 (Tex.App.—Houston [1st Dist.] 1994, writ denied). Each provision must be construed in the context of the entire statute of which it is a part. *Bridgestone/Firestone, Inc.*, 878 S.W.2d at 133 ("Only in the context of the remainder of the statute can the true meaning of a single provision be made clear."). We also should not adopt a construction that would render a law or provision absurd or meaningless. *See Chevron Corp. v. Redmon*, 745 S.W.2d 314, 316 (Tex.1987); *Mueller v. Beamalloy*, 994 S.W.2d 855, 860 (Tex.App.—Houston [1st Dist.] 1999, no pet.).

In addition, the legislature has expressly stated that when construing a statute we may consider: (1) circumstances under which the statute was enacted, (2) legislative history, (3) common law/former statutory provisions, including laws on same or similar subjects, (4) consequences of a particular construction, (5) administrative construction of statute, and (6) its title/preamble. Tex.Gov't Code Ann. § 311.023 (Vernon 1988). With these rules in mind, we turn to the disputed provisions of the city charter.

### b. Initiative and Referendum

■ The Houston City Charter specifically grants to the people of Houston the power of direct legislation by initiative and referendum.[10] Accordingly, any ordinance passed by City Council is subject to being suspended, until it is submitted to and passed by popular vote, if a petition signed by a sufficient number of qualified voters is timely filed with the city secretary protesting against the enactment or enforcement of such ordinance.[11] Charter provisions are to be liberally construed in favor of the power of initiative and referendum. *Glass v. Smith*, 150 Tex. 632, 244 S.W.2d 645, 649 (1951). Depending on the type of ordinance involved, the number of qualified signatures required for the petition for referendum varies.

### c. Charter Provisions Relied on by the City and METRO

In addition to the "General Powers," [12] and the referendum provisions applicable to ordinances generally,[13] the City relies

---

10. Houston, Tex., City Charter art. VII-b, (added by amendment Oct. 15, 1913).

11. *Id.*

12. *Id.* at art. II, § 2 (Act of 1905; amend. Oct. 15, 1913) ("The City Council shall have power to enact ... all ordinances necessary to protect life, health and property ... to preserve and promote ... the general welfare ... to exercise all municipal powers necessary to the complete and efficient management and control of municipal property and affairs of said city ... and to enact and enforce any and all ordinances upon any subject....").

13. *Id.* at art. VII-b, § 3 (Act of 1905); *Id.* at art. V, § 10 (Added by amendment May 29, 1951).

on the "Street Powers"[14] provision that specifically states:

> The City of Houston shall have the power to ... supervise, maintain and improve streets, alleys, sidewalks ... and bridges; and to ... regulate the use thereof.

Clearly, in the absence of another, overriding provision, the "Street Powers" and "General Powers" provisions provide authority for the City to pass Ordinance 2000–1028. If the City properly acted pursuant to its "Street Powers" and "General Powers," the petition for referendum, with approximately 1100 signatures, lacked enough signatures to require a public vote according to article V, section 10 and article VII-b, section 3.[15]

### d. Charter Provisions Relied on by Trial Court

As stated above, the trial court concluded that the "Street Powers" and "General Powers" provisions did not control; rather, the trial court concluded that article II, sections 17 and 18 of the Houston City Charter apply to Ordinance 2000–1028. The relevant provisions of sections 17 and 18 are:

> **Section 17. Franchises.**
>
> [N]o grant of any franchise or lease, or right to use the [streets, highways, public thoroughfares and property of the City of Houston, its avenues, parks, bridges and all other public places and property], either on, along, through, across, under or over the same by any *private corporation, association or individual,* shall be granted by the City Council unless submitted to the vote of the legally qualified voters of said City,

for a longer period than thirty years ... provided ... that no grant shall be made or authorized for a longer period than fifty years.

... No such franchise shall ever be granted until it has been read in full at three regular meetings of the Council, nor shall any such franchise, grant, right or easement ever be made to any *private individual, corporation or association,* unless it provides for adequate compensation or consideration therefor....

HOUSTON, TEX., CITY CHARTER art. II, § 17 (Act of 1905) (emphasis added).

> **Section 18. Referendum.**
>
> Whenever application is made to the city council of the City of Houston for any *such* grant or franchise, lease or right to use the streets, public highways, thoroughfares or public property of the City of Houston *as is provided for in the preceding section of this act,* or whenever an ordinance is introduced in the city council proposing to make the grant of any franchise, lease or right to use public highways, streets, thoroughfares and public property of the City of Houston, such ordinance shall set forth in detail all the rights, powers and privileges granted or proposed to be granted....
>
> Pending the passage of any such ordinance or during the time intervening between its final passage and approval by the mayor, and the expiration of thirty days before which time it shall take effect, it is hereby made the duty of the city council *to order an election if requested so to do by written petition signed by at least five hundred legally*

---

14. *Id.* at art. II, § 4 (Act of 1905).

15. There appears to be agreement that, under Houston City Charter article V, section 10 and article VII-b, section 3, approximately 20,000 qualified signatures would be required

on a petition for referendum protesting against an ordinance passed pursuant to the City's "General Powers" and "Street Powers" under article II, sections 2 and 4.

*qualified voters of said city,* at which election the legally qualified voters of said city shall vote for or against the proposed grant as set forth in detail by the ordinance conferring rights and privileges on the applicants. . . .

No grant of franchise, or lease or right of user, in, upon, along, through, under or over the public streets, highways or public thoroughfares of the City of Houston shall be made or given nor shall any rights of any kind whatever be conferred upon any *person, private corporation, individual or association of whatever kind,* except the same be made by ordinance duly passed by city council. . . .

*Id.* at § 18 (Act of 1905; amended Aug. 14, 1982) (emphasis added).

If the trial court is correct that sections 17 and 18 control, then the petition for referendum needed only 500 signatures of legally qualified voters, and the petition is therefore adequate to require a public vote pursuant to section 18 because approximately 1100 signatures were obtained.

■■■ The issue to be decided is whether the provisions relied on by the trial court "trump" the more general "Street Powers" and "General Powers" provisions. A rule of statutory construction is that a provision dealing specifically with a subject matter controls over a more general provision. *See Hammond v. City of Dallas,* 712 S.W.2d 496, 498 (Tex.1986).

### e. *Public v. Private Entity*

We construe sections 17 and 18 together. *See White Top Cab Co. v. City of Houston,* 440 S.W.2d 732, 736 (Tex.Civ. App.—Houston [14th Dist.] 1969, no writ). The first paragraph of section 18 clearly references Section 17. Sections 17 and 18 deal with the initial grant of a franchise, lease, or right to use the streets of Houston to a *private corporation, association*

*or individual,* or a *private individual, corporation or association,* or a *person, private corporation, individual, or association of whatever kind.* It is not disputed that METRO is a *public* political entity that exercises *public* and essential governmental functions. Tex.Transp.Code Ann. § 451.052(a)(1),(3). METRO is not a *private* corporation, *private* association, *private* individual, or *private* person. Direct reference to a "public" entity as a grantee appears nowhere in sections 17 or 18; direct reference to "private" entities as grantees appears throughout.

It is appropriate for us to consider how the City of Houston itself has interpreted sections 17 and 18. *See City of Grand Prairie v. Finch,* 294 S.W.2d 851, 854 (Tex. Civ.App.—Dallas 1956, no writ); *State ex rel. Richmond Plaza Civic Ass'n. v. City of Houston,* 270 S.W.2d 235, 238 (Tex.Civ. App.—Galveston 1954, writ ref'd n.r.e.). The uncontroverted record shows that for more than 20 years the City has given METRO permission to make alterations to city streets without ever requiring MET-RO to obtain a franchise or right to use the streets under sections 17 and 18. Further, the record includes an example of a franchise granted by the City pursuant to sections 17 and 18, a March 1966 franchise agreement between the City and the *privately-owned* Houston Transit Lines, which required the payment of an annual franchise fee by Houston Transit Lines. Private entities seek to use the streets for the purpose of private enterprise and, as such, are required by section 17 to pay the City an "adequate compensation" and an annual "fixed charge" for their use of the streets. METRO, a public entity that was granted the right to use public streets by State statute, is appropriately not required to pay the City of Houston any compensation for the use of its public streets under the Consent Agreement, paragraph 2.3.

It is also proper for us to consider the circumstances under which sections 17 and 18 were enacted in 1905. *See* Tex. Gov't Code Ann. § 311.023(2). Courts of appeals may take judicial notice of facts that are notorious, well-known, or easily ascertainable. *See Eagle Trucking Co. v. Texas Bitulithic Co.*, 612 S.W.2d 503, 506 (Tex.1981); *Lewis v. State*, 674 S.W.2d 423, 426 (Tex.App.—Dallas 1984, pet. ref'd). We judicially notice that by the year 1900 there were railroads that supplied transportation to all developed sections of Texas.[16] By 1901, about 50 industrial plants were located in Houston.[17] In April 1901, the first automobile arrived in Houston, and in 1903 the speed limit in Houston was six miles-per-hour.[18] In April 1904, construction began on the Houston to Galveston electric urban line, and in April 1905, the first oil pipeline reached Houston from the Humble fields.[19]

The parties in this litigation acknowledge that the drafters of sections 17 and 18 had the privately-owned railway companies in mind when they enacted the provisions. In fact, the last paragraph of section 18 contains the proviso:

> [p]rovided, however, that the provisions of this section shall not apply to the granting of sidetrack or switch privileges to railway companies for the purpose of reaching, and affording railway connection and switch privileges to the owners or users of any industrial plants; it being the intention to permit the city council to grant such rights of privileges to railway companies whenever in their judgment the same is expedient, necessary or advisable.

We are led to the conclusion that in 1905 the framers of the Houston City Charter had in mind the granting of franchises, pursuant to sections 17 and 18, to *privately-owned* entities, such as railway companies.

Applying established rules of construction—considering the plain and common meaning of the words used, the historical context of the legislation, and the past application of the provisions by the City—we hold that article II, sections 17 and 18, do not apply to METRO, a public entity. Accordingly, sections 17 and 18 have no application to Ordinance 2000–1028 and the Consent Agreement.

### f. *Emergency Provision*

Article VII, section 7 was another basis on which the trial court relied for the injunctive relief. Article VII, section 7 provides as follows:

> **Section 7. Passage of ordinance after introduction.**
>
> No ordinance shall be passed finally on the date it is introduced, except in the case of public emergencies, and then only when requested by the Mayor in writing; *provided that no ordinance or resolution making a grant of any franchise or special privilege shall ever be passed as an emergency measure.*

Houston, Tex., City Charter art. VII, § 7 (Act of 1905; amend. Aug. 15, 1942) (emphasis added). Here, Ordinance 2000 1028 was passed by an emergency measure. However, the only provisions in the city charter that govern the passage of an ordinance making a grant of a franchise or special privilege are article II, sections 17 and 18. Because sections 17 and 18 do not

---

**16.** *See* Marvin Hurley, *Turn of The Century* (August 28, 2000) <http://www.neosoft.com/sgriffin/houstonhistory/decades/history5g.htm>.

**17.** *Id.*

**18.** *Id.*

**19.** *Id.*

apply to Ordinance 2000–1028, neither does article VII, section 7.[20]

 We sustain METRO's issue one and the City of Houston's issue two. In light of our ruling on these issues, we need not address the remaining issues, and we decline to do so.[21]

### CONCLUSION

We hold the trial court erred in its application of the law to the undisputed facts. We reverse the trial court's order, dissolve the temporary injunction, and remand the cause to the trial court.

### ORDER ON MOTIONS FOR REHEARING AND FOR EN BANC REHEARING

Appellees, Allan Vogel and Rob Todd, each filed a motion for rehearing. The panel denies the motions for rehearing.

Appellees also filed a joint motion for en banc rehearing. A majority of the Justices of the Court voted to deny the motion for en banc rehearing.

The Clerk of this Court is directed to issue mandate within 10 days of the date of this order unless one of the parties files a petition for review in the Texas Supreme Court. TEX.R.APP.P. 18.6.

It is so **ORDERED.**

Justice BRISTER dissents from the denial of the motion for en banc rehearing.

BRISTER J., dissenting on denial of rehearing en banc.

I respectfully dissent from the denial of the motion for rehearing en banc.

I believe the panel opinion applies the wrong standard of review. Interlocutory review of a temporary injunction should not be used to issue an advance ruling on the merits. *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex. 1981). Yet this is exactly what the panel opinion does. *See* Rad Sallee, *Court Gives Green Light to Light Rail,* HOUSTON CHRON., Mar. 9, 2001, at 1 (quoting Metro's counsel that panel opinion is "essentially a final judgment").

The panel says our task is to construe certain state and city laws. In an appeal based on a summary judgment or trial, that would be correct. But in an appeal from a temporary injunction, our task is only to decide whether the trial court abused its discretion in granting the temporary injunction. *Iranian Muslim Org.,* 615 S.W.2d at 208. To abuse its discretion in applying the law, a trial court must make a gross and prejudicial error of law, not a mere error in judgment. *Johnson v. Honorable Fourth Court of Appeals,* 700 S.W.2d 916, 918 (Tex.1985). If there is some basis in reason and law for the trial court's order, we cannot disturb it. *Id.*

The panel reverses the temporary injunction apparently on the basis that appellees Todd and Vogel have no probable right to relief under sections 17 and 18 of article II of the Houston City Charter. "Probable right to relief" is a term of art that does not imply any final determination that becomes the law of the case. *183/620 Group Joint Venture v. SPF Joint Venture,* 765 S.W.2d 901, 904 (Tex.App.— Austin 1989, writ dism'd w.o.j.). When the issuance of a temporary injunction turns

---

**20.** Similarly, even if, as appellees have argued, Transportation Code section 311.073 applies to this case, the petition for referendum lacks a sufficient number of signatures (approximately 20,000 needed) because sections 17 and 18 do not apply.

**21.** We note that appellee Vogel has standing under *Blum v. Lanier,* 997 S.W.2d 259, 262 (Tex.1999).

on provisions that must be construed rather than on clear language, a trial court does not abuse its discretion in either granting or denying the relief. *Id.; see also Davis v. Huey,* 571 S.W.2d 859, 862–63 (Tex.1978). A substantial difference of opinion as to the proper construction of documents is alone sufficient to justify a temporary injunction. *Simon Prop. Group (Tex.) L.P. v. May Dep't Stores Co.,* 943 S.W.2d 64, 74 (Tex.App.—Corpus Christi 1997, no writ).

Unquestionably, the ordinances at issue are subject to different constructions. To its credit, the City admits that its charter provisions are ambiguous. The panel opinion mercifully cuts most of the forest of words used in these provisions to try to clear its view. Yet numerous obstacles remain. For example, in the phrase "private corporation, association or individual" or the phrase "private individual, corporation or association," it is certainly plausible to hold (as the panel does) that the initial adjective modifies all the following nouns. But it is just as plausible in English usage that it modifies only the first. And the final reference to "any ... association of whatever kind" is an odd way to exclude all public entities. Under an abuse of discretion standard, I believe the ambiguities in these sections are enough to justify the trial court's ruling.[1]

Trial courts have no discretion to misconstrue the law. But they do have discretion to decide whether the status quo should be preserved when the law is not entirely clear. The panel's premature review of the merits denies appellees their right to trial by jury. It also assumes that the evidence taken at a preliminary hearing will be the same as the evidence developed at a full trial on the merits.[2] This assumption may not be true. *See Davis,* 571 S.W.2d at 862.

The panel opinion adopts a simple and straightforward construction of the city charter, one that perhaps we ultimately should adopt. But at this point, we must affirm if the trial court's order is supported by a plausible legal theory and evidence tending to sustain it. *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.,* 965 S.W.2d 18, 23–24 (Tex. App.—Houston [1st Dist.] 1998, no pet. and mand. dism'd). Because I believe it is, I would grant the motion for rehearing en banc and affirm.

---

1. I concede that on some occasions the courts have issued case-dispositive constructions of law in the course of reviewing a temporary injunction. But generally this has occurred only when there was no other way to review the issue. *See, e.g., Republican Party v. Dietz,* 940 S.W.2d 86, 93–94 (Tex.1997) (dissolving TI on the day before political party's state convention began); *Iranian Muslim Org.,* 615 S.W.2d at 209 (mandating TI to permit parade as short-lived nature of public protests rendered the matter capable of repetition yet evading review).

2. When the dispositive issue is one of applying the law to undisputed facts, the far better practice is for the parties to use the temporary injunction hearing as a trial on the merits. *Iranian Muslim Org.,* 615 S.W.2d at 208–09. Then we would review the trial court's construction of the charter provisions de novo, rather than for abuse of discretion. The record reflects that the trial court suggested this procedure, but it was rejected by METRO and the City.