Opinion issued February 5, 2010








 

 





 

In The

Court of Appeals

For The

First District of Texas

____________


NO. 01-07-00764-CV

____________


SCOTT D. UPTEGRAPH JR. AND KARA K. UPTEGRAPH, Appellants


V.


SANDALWOOD CIVIC CLUB, Appellee






On Appeal from the 333rd District Court

Harris County, Texas

Trial Court Cause No. 2006-22516






O P I N I O N

 Scott Uptegraph Jr. and Kara K. Uptegraph appeal from a final judgment
awarding Sandalwood Civic Club ("Sandalwood CC") injunctive relief to enforce its
restrictive covenants, a declaratory judgment affirming its authority to enforce the
restrictive covenants, damages pursuant to section 202.004(c) of the Texas Property
Code, (1) costs, attorney's fees, and pre- and post-judgment interest. In three issues, the
Uptegraphs assert that (1) the trial court misinterpreted the Sandalwood subdivision
deed restrictions, (2) there is insufficient evidence to support the trial court's findings
of facts and conclusion of law that Sandalwood CC acted reasonably in denying the
Uptegraphs' fence plans and denying an exception to the deed restriction, and (3) the
trial court erred in assessing damages under section 202.004(c) without evidence of
actual injury or harm. 

 We affirm.

Background 

 In June of 2004, the Uptegraphs bought a lot with house on the corner of
Sandalwood Drive and Beechmont Road in the Sandalwood subdivision, located in
the Memorial area of the city of Houston, Texas. The Sandalwood subdivision is
subject to deed restrictions--enforced by Sandalwood CC--which include specific
setback requirements governing the placement of structures on each lot. The recorded
plat for the Uptegraph property depicts a 25-foot building setback line along the side
of the lot facing Sandalwood Drive and a 10-foot building setback line along the side
facing Beechmont Road. The Architectural Control Committee (ACC), which
operates independently from Sandalwood CC, governs building approvals within the
Sandalwood Subdivision.

 After the Uptegraphs purchased their property, they made plans to replace the
existing house, which faced Sandalwood Drive, with a new one that would face
Beechmont Road. They submitted a set of proposed plans for the new house to the
ACC in July 2004. This first set of plans depicted (1) a 15-foot building line along
Sandalwood Drive and a 25-foot building line along Beechmont Road, (2) a
proposed fence on the Sandalwood Drive side of the lot that enclosed the backyard,
but not the motor court, and was further away from Sandalwood Drive than the 25-foot setback line depicted in the recorded plat, and (3) a proposed three-car garage
that was set back approximately 16 feet from the Sandalwood Drive side of the lot,
and closer to the street than the 25-foot setback line depicted in the recorded plat. 
The plans were rejected by the ACC because the proposed three-car garage was closer
to the street than the 25-foot setback line for the Sandalwood Drive side of the lot. 
The Uptegraphs' builder subsequently sent a letter to the ACC explaining that he
mistakenly thought that, based on the frontage change, the setback line originally
applicable to Beechmont Road would become applicable to Sandalwood Drive. In
other words, the builder assumed that the setback lines reflected on the plat were
relative to the orientation of the house, rather than to a particular street, and so subject
to change if the orientation of the house changed. 

 In October 2004, the Uptegraphs submitted a second set of proposed plans to
the ACC. This second set of plans depicted (1) a 25-foot building line along
Sandalwood Drive and 10-foot setback line on Beechmont Road, consistent with the
building lines depicted in the recorded plat, (2) the same fence enclosing the backyard
as in the first plans, further back from the street than the 25-foot setback line depicted
on the plat, and (3) a two-car garage built further away from the street than the 25-foot setback line depicted on the plat. The ACC approved these proposed plans on
October 19, 2004. 

 A year later, in late October 2005, an ACC member drove by the Uptegraph
lot and saw a wrought iron fence being constructed that appeared to be significantly
outside of the setback line, almost to the street. Unbeknownst to the ACC, the
Uptegraphs had had a survey drafted earlier that month that depicted a significant
change in the location of the previously-approved fence enclosing the back yard. As
depicted on the new survey, the fence was to be moved much closer to Sandalwood
Drive, enclosing not only the backyard, but the motor court and a large portion of the
yard on the Sandalwood Drive side of the property as well, bringing the fence much
closer to the street than the 25-foot building line for the Sandalwood Drive side of the
lot. The ACC sent a letter to the Uptegraphs on October 23, 2005, advising them to
stop construction on the fence because it was closer to the street than the 25-foot
setback line applicable to that side of the property and because no plans for this fence
in such a location had been approved by the ACC. The Uptegraphs temporarily
stopped construction on the fence and submitted a set of plans for the fence under
construction to the ACC on October 25, 2005. This set of plans, the third set of plans
overall, depicted (1) the originally approved fence enclosing the back yard, (2) a new
proposed wrought iron fence between the end of the garage and motor court and the
Sandalwood Drive side of the property, much closer to the street than the 25-foot
setback line along Sandalwood Drive, (3) a new sidewalk leading from Sandalwood
Drive to a gate in the new fence, and (4) a widened driveway. After reviewing the
plans, the ACC rejected them. Although the Uptegraphs' builder had been verbally
notified of the ACC's rejection of the plans, the Uptegraphs completed the
construction of the new fence. On November 2, 2005, the ACC sent a letter to the
Uptegraphs' builders, with a copy to the Uptegraphs, explaining that the new fence
did not comply with the setback specified by the Sandalwood deed restrictions, that
construction began without approval of the revised site plan--which itself was a
violation of the deed restrictions, and that a concrete sidewalk and driveway that were
not part of the approved plan were now installed. The letter advised submission of
revised site plans and concluded by noting that the builders completed the fence after
the ACC informed them of the rejection of the plans, and consequently, the
Sandalwood CC Board of Directors (the "Board") considered the builder to be in non-compliance and would proceed with further steps to obtain compliance with the deed
restrictions. 

 On November 7, 2005, the Uptegraphs submitted a fourth overall set of plans,
the second set pertaining to the newly designed fence and driveway, to the ACC. 
This set of plans again depicted (1) the originally approved fence enclosing the back
yard, (2) the newly constructed wrought iron fence that was much closer to the street
than the 25-foot setback line along Sandalwood Drive, (3) a new sidewalk leading
from Sandalwood Drive to a gate in the new fence, and (4) a widened driveway; the
plans also now included required vegetation-to-concrete ratios. The ACC approved
the new concrete portions of the plan, but rejected the portion of the plans that
showed the newly constructed fence because it was closer to the street than the 25-foot setback line. The Board voted to enforce the ACC's rejection of the fence, but
sought a meeting with the Uptegraphs to try to resolve the issue.

 A meeting occurred between representatives from the Board, the ACC, and the
Uptegraphs on November 28, 2005, at the Uptegraphs' lot. Mr. Uptegraph shared his
concern that the currently permitted configuration--the second set of plans which
was approved by the ACC on October 19, 2004--would not allow him to maneuver
his SUV into the garage. Alternative fencing arrangements were discussed that would
not violate the deed restrictions, but no agreement was reached, and the Board
subsequently sent the Uptegraphs a letter, dated December 15, 2005, summarizing the
events that had transpired with regard to the fence. The letter pointed out that the
ACC had approved the plans submitted by the Uptegraphs for a compliant fence, but
the Uptegraphs had proceeded to build a fence that was non-compliant and that had
not been approved by the ACC. The letter notified the Uptegraphs that the Board
would sue within 30 days of the Uptegraphs' receipt of the letter, if the fence that 
was closer than 25 feet to Sandalwood Drive was not removed. Mr. Uptegraph
responded by requesting a hearing before the Board.

 On February 2, 2006, Jack Reynolds, attorney for the Board, sent a letter
notifying the Uptegraphs that the hearing had been scheduled for February 15th and
that, if the Board ruled against them, the fence would have to be removed no later
then March 18, 2005, or a suit would be filed. At the hearing, Mr. Uptegraph stated
that he wanted the fence for the safety of his children. After discussing the matter,
the Board voted to deny the Uptegraph's appeal of the decision of the ACC and to
require the Uptegraphs to remove the portion of the fence that was closer to the street
than the setback line.

 Reynolds sent a letter to Stephen Lee, counsel for the Uptegraphs, on February
16, 2006, notifying him of the decision reached by the Board. The letter reiterated
that the Uptegraphs had until March 18, 2006, to remove the portion of the fence that
was closer to the street than the setback line or a suit would be filed seeking
injunctive relief, attorney's fees, court costs, and damages of up to $200 per day of
the violation. Reynolds further expressed that, if the Uptegraphs wanted to replace
the existing non-compliant fence with one that complied with the restrictive
covenants and the setback line, they could file an application with the ACC for its
consideration. 

 Almost a month later, on March 14, 2006, Lee replied that the Uptegraphs
objected to the procedure implemented by the Board because the entire Board was not
present for their appeal (2) and the Uptegraphs demanded that the entire Board convene
a meeting at the earliest available time to allow them to present their appeal to the
entire Board. Attached to Lee's letter was a fifth overall set of plans, the third
pertaining to the fence in question, depicting the location of fences that the
Uptegraphs intended to erect on their property if their appeal was denied. In these
plans, the Sandalwood Drive fence was located further from the street than the
setback line. The plans also contained, for the first time, a fence on the Beechwood
Road side of the lot. The letter also stated that the plans were being submitted
without waiver of the Uptegraph's contention that the Board's action had been
improper.

 Reynolds replied to Lee by letter the following day, stating that there would be
no additional meeting with the Board and that the Board's last decision stood.
Reynolds added that he had forwarded the plans to the ACC and, if the Uptegraphs
would agree in writing, prior to March 18, 2006, that if the plans were approved, they
would immediately commence construction necessary to complete the proposed
modifications and complete construction within 30 days of the plans' approval, the
Board would forego filing a lawsuit. 

 On March 20, 2006, Lee responded that the Uptegraphs, without the waiver of
any rights, had agreed to move the Sandalwood Drive fence if the Board approved the
fifth set of plans. Lee's letter specifically reserved the Uptegraphs' rights to seek any
remedies, including filing suit, to reinstall the Sandalwood Drive fence in the current
location and to seek the costs of removing and replacing the fence, along with the
cost of the substitute fencing depicted on the fifth set of plans.

 Reynolds replied to Lee on March 24, 2006, informing him that, while the
fence on the Sandalwood Drive side of the lot appeared to be properly located with
regard to the 25-foot setback line, the proposed plans did not specify the height of the
fence or the materials to be used. The ACC was also concerned that the driveway
depicted in the fifth set of plans was an old configuration that had already been
changed with approval from the ACC. Therefore, a formal submission of plans
addressing these issues would need to be submitted. Reynolds also relayed a
proposed settlement from the Board with a mutual release of claims, offering to waive
claims for costs, attorney's fees, and statutory damages, and setting the deadline for
resolution on March 29, 2006.

 On March 29, 2006, Lee forwarded a sixth set of plans to the Board. The plans
depicted a six-foot-high-wrought-iron fence set 25 feet back from Sandalwood Drive
and a new 10-foot-high wood fence running along the front of the property set 10 feet
back from Beechmont Road. In an accompanying letter, Lee stated that the
Uptegraphs declined the Board's settlement offer and reiterated that his clients would
remove the "allegedly offending fence" if the new plans were approved, but would
not release their right to seek any available remedies, including filing suit to reinstall
the fence in its current location. Lee tendered a counteroffer from the Uptegraphs to
re-route portions of the existing fence.

 Reynolds replied in an email that if an agreement was not reached by March
31, 2006, the Board would file suit on Monday, April 3, 2006. The Uptegraphs then
removed some of the wrought iron panels and replaced them with temporary orange
webbing, but, through an email from Lee, reserved their right to seek available
remedies.

 Reynolds sent a letter to Lee on April 6, 2006, informing him that the ACC had
met and approved the proposed new fence facing Sandalwood Drive, as depicted in
the sixth set of plans, but did not approve the proposed fence facing Beechmont
Road. (3) The letter also stated that every portion of the already constructed fence that
was closer to the street than the setback line had to be removed before Sunday, April
9, 2006, and a mutual release agreed upon and entered by that date, or suit would be
filed on Monday, April 10, 2006.

 Portions of the fence that were closer to the street than the setback line were
not removed by April 9, 2006, and Sandalwood CC filed suit against the Uptegraphs
on April 10, 2006, seeking injunctive relief to enforce its restrictive covenants, a
declaratory judgment affirming its authority to enforce the restrictive covenants,
damages pursuant to section 202.004(c) of the Texas Property Code, costs, attorney's
fees, and pre- and post-judgment interest. The Uptegraphs responded with a general
denial and affirmative defenses and also raised counterclaims seeking a declaratory
judgment that their fence did not violate the deed restrictions or, alternatively, that
Sandalwood CC had been arbitrary, capricious, or discriminatory in not granting the
Uptegraphs a "variance," and damages for breach of contract, costs, and attorney's
fees.

 After a two-day bench trial, the trial court signed a final judgment in favor of
Sandalwood CC, granting Sandalwood CC its requested injunctive and declaratory
relief, $20,000 in damages pursuant to Texas Property Code 202.004, $75,000 in
attorney's fees, additional attorney's fees if the case was appealed, costs, and pre- and
post-judgment interest. The trial court denied the Uptegraphs' counterclaim and
ordered that they take nothing on it. 

Interpretation of the Restrictive Covenant

 In their first issue, the Uptegraphs contend that the trial court erroneously
interpreted provisions of the restrictive covenant regarding the minimum distances
at which fences must be placed from Sandalwood Drive. The Uptegraphs challenge
the trial court's finding of fact number 7 that "[t]he minimum setback line on
Defendants' property along Sandalwood Drive is 25 feet." We construe the
Uptegraphs' first issue to be a challenge to the trial court's interpretation of the
restrictive covenant as a matter of law. See Tex. R. App. P. 38.1(f), 38.9; Sterner v.
Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989).

A. Rules governing the construction of restrictive covenants

 1. Standard of review

 The subdivision's deed restrictions are restrictive covenants concerning real
property. See Tex. Prop. Code Ann. § 202.001(4) (Vernon 2007) (defining
restrictive covenant). Restrictive covenants are subject to the general rules of
contract construction. Pilarcik v. Emmons, 966 S.W.2d 474, 478 (Tex. 1998); Bank
United v. Greenway Improvement Ass'n, 6 S.W.3d 705, 707 (Tex. App.--Houston
[1st Dist.] 1999, pet. denied). As when interpreting any contract, the court's primary
duty in construing a restrictive covenant is to ascertain the drafter's intent from the
instrument's language. Bank United, 6 S.W.3d at 708. In ascertaining the drafter's
intent, we must examine the covenant as a whole in light of the circumstances present
when the covenant was made. Pilarcik, 966 S.W.2d at 478. We must give a
restrictive covenant's words and phrases their commonly accepted meaning. Truong
v. City of Houston, 99 S.W.3d 204, 214 (Tex. App.--Houston [1st Dist.] 2002, no
pet.). We review a trial court's interpretation of a restrictive covenant de novo. Air
Park-Dallas Zoning Committee v. Crow Billingsley Airpark, Ltd., 109 S.W.3d 900,
909 (Tex. App.--Dallas 2003, no pet.).

 Whether restrictive covenants are ambiguous is a matter of law for the court to
decide. Pilarcik, 966 S.W.2d at 478; Samms v. Autumn Run Cmty. Improvement
Ass'n, Inc., 23 S.W.3d 398, 402 (Tex. App.--Houston [1st Dist.] 2000, pet. denied). 
A covenant is unambiguous if, after appropriate rules of construction have been
applied, the covenant can be given a definite or certain legal meaning. Pilarcik, 966
S.W.2d at 478; Pitman v. Lightfoot, 937 S.W.2d 496, 517 (Tex. App.--San Antonio
1996, writ denied) (holding same concerning contracts generally). In contrast, if,
after appropriate rules of construction have been applied, a covenant is susceptible
of more than one reasonable interpretation, the covenant is ambiguous. Pilarcik, 966
S.W.2d at 478; Universal C. I. T. Credit Corp. v. Daniel, 243 S.W.2d 154, 157 (Tex.
1951). Mere disagreement over a restrictive covenant's interpretation does not
necessarily render the covenant ambiguous. Air Park-Dallas Zoning Comm., 109
S.W.3d at 909. 

 2. Common law versus section 202.003(a)

 At common law, covenants restricting the free use of land are not favored but
will still be enforced when they are confined to a lawful purpose and are clearly
worded. E.g., Wilmoth v. Wilcox, 734 S.W.2d 656, 657 (Tex. 1987). Accordingly,
under the common law, a restrictive covenant's words cannot be enlarged, extended,
stretched, or changed by construction. Id. All doubts concerning a restrictive
covenant's terms are resolved in favor of the free and unrestricted use of the land, and
any ambiguity must be strictly construed against the party seeking to enforce the
covenant. Id.

 In 1987, the Legislature amended the Texas Property Code to provide that all
restrictive covenants contained in instruments governing certain residential
developments, regardless of the date on which the covenants were created, must be
liberally construed to give effect to their purposes and intent. See Act of May 23,
1987, 70th Leg., R.S., ch. 712, § 1, 1987 Tex. Gen. Laws 2585, 2585) (current
version at Tex. Prop. Code Ann. §§ 202.002(a), 202.003(a) (Vernon 2007)). 

 3. Split among the courts

 Some courts of appeals have recognized that the common-law requirement of
construing restrictions strictly and section 202.003(a)'s requirement of construing
residential covenants liberally to effectuate their purposes and intent might appear
contradictory. (4) As a result, some courts of appeals have held or implied that section
202.003(a)'s liberal-construction rule concerning residential covenants supersedes
the common-law rule of strict construction. (5) In contrast, other courts of appeals,
including ours, have concluded that there is no discernable conflict between the
common law and section 202.003(a). (6) Even among the courts that believe that the
common law and section 202.003(a) can be reconciled, there exists a split in how to
apply section 202.003(a). Some of these courts, including ours, have simply
continued to apply the common-law rule without a precise explanation of how to
reconcile it with section 202.003(a). (7) Other courts of appeals have held that the
common-law rule applies only when there is an ambiguity concerning the drafter's
intent, but to determine if such an ambiguity exists, these courts first apply section
202.003(a)'s liberal-construction mandate. (8) 

 Finally, we note that some courts of appeals since 1987 have simply continued
applying the common-law strict-construction rule without referring to section
202.003(a) at all. (9) Others, including ours, have applied section 202.003(a)'s liberal-construction standard without referring to the common-law construction principles
at all. (10) 

 The Texas Supreme Court has noted, but not yet resolved, the potential conflict
between the common law and section 202.003(a). See Pilarcik, 966 S.W.2d at 478;
see also Hebert, 943 S.W.2d at 908 n.2 (noting that supreme court's opinion in
Wilmoth--which relied on common-law restrictive-covenant-construction rules and
not on section 202.003(a)--issued soon after section 202.003(a)'s effective date, but
that issue of whether section 202.003(a) changed the common-law construction rules
was not raised or briefed in Wilmoth).

 4. This Court's approach

 In this case, neither party asserts that the covenant is ambiguous. The trial court
found that the covenant is unambiguous, and we agree. Because the covenant is
unambiguous, our interpretation of the Sandalwood covenant is the same under both
the common law and section 202.003(a). Because the Supreme Court has not yet
spoken on the issue, and because the outcome of this case does not rely on our
resolving any ambiguity between the common law and section 202.003(a), it is
unnecessary for us to address that question. 

B. Sandalwood covenants The following sections from article II of Sandalwood subdivision's restrictive
covenants apply to the Uptegraphs' fence:

2. No building, structure, fence, wall or other improvement shall be
erected, placed or altered on any lot or lots until the construction
plans, specifications and design and a plan showing the location
of the structure on the lot or lots have been approved by a
majority of the [ACC], including approval as to quality of
workmanship and materials, harmony of external design with
existing structures, and as to location with respect to topography
and finish grade of elevation.


[ . . . .]

 

9. No fence or wall shall be erected, altered, placed or permitted to
remain on any lot nearer to the street than the minimum building
setback line unless approved by the [ACC] . . . .


 The primary disagreement between the Uptegraphs and Sandalwood CC is the
meaning of the term "minimum building setback line" in section 9. The Uptegraphs
assert that the plain meaning of this phrase is the least of all setback lines applicable
to a property. In support of their position, the Uptegraphs compare the language in
section 9 with the language in sections 7, 8, and 14:

7. No residence or building of any kind shall be located on any lot
nearer to the front lot line or nearer to the side street line than the
building setback lines shown on the appropriate recorded plat. .
. .


8. In addition to meeting the requirements of the building setback
lines, as shown on the appropriate recorded plat, no building,
except a detached garage, out-building or guest or servants
quarters located 65 feet or more from the front lot line shall be
erected, placed or altered on any lot nearer than five feet from any
side lot line. No detached garage, out-building or guest or
servants quarters, including their roofs and gutters, that is located
65 feet or more from the front lot line shall be erected, placed or
altered on any lot nearer than three feet from any side lot line.


[ . . . .]


14. In addition to meeting the requirements of the building setback
lines as shown on the appropriate recorded plat, and the existing
setbacks contained in the Deed Restrictions, and notwithstanding
anything else contained in the Deed Restrictions to the contrary,
no first floor of any building, including the roof and gutter shall
be located nearer to the rear lot line than ten feet (10'), and no
building, including the roof and gutter, shall be located nearer to
a side lot line than five feet )(5'). . . . If there is a disagreement
with the [ACC] concerning the determination of side and/or rear
setbacks, then appeal may be made to the Board of Directors of
Sandalwood Civic Club, Inc. ("Board of Directors") for
determination. Unless the Board of Directors votes unanimously
to override the [ACC], the determination of the [ACC] shall be
final. . . .

 

 The Uptegraphs note that phrase "minimum building setback line" appears in
section 9, but does not appear anywhere else in the restrictive covenants. They also
note that, while the phrase "shown on the appropriate recorded plat" is included in
several other sections, it does not appear in section 9. Therefore, the Uptegraphs
argue, the term "minimum building setback line" refers to the minimum possible
distance that any structure may be built from any lot line on the property, and assert
that that distance is five feet--the minimum distance that a building must be located
from the side lot line according to section 14, and reflected on the recorded plat as a
utility easement. The Uptegraphs assert that since section 9 does not specifically
reference the recorded plat, the term "building setback line" in section 9 refers to not
only the building setback lines found on the recorded plat but also any setbacks in the
Sandalwood deed restrictions. They then argue that section 14 of Sandalwood's deed
restrictions contains a five-foot building setback line applicable to their property and
this is the "minimum building setback line" referenced in section 9.

 This interpretation lacks merit. We first note that the five-foot setback in
section 14 specifically applies to a setback from the "side lot line," while section 9
deals exclusively with the distance "from the street" that a fence or wall may be built,
as established by the "minimum building setback line." Thus, the "side lot line"
setback established by the deed restrictions in section 14 cannot be the "minimum
building setback line" from "the street" that a fence or structure must be located as
required by section 9. Additionally, section 14 does not refer to setbacks contained
in the deed restrictions as "building setback lines." Rather, it states,"[i]n addition to
meeting the requirements of the building setback lines as shown on the appropriate
recorded plat, and the existing setbacks contained in the Deed Restrictions . . . ."
(emphasis added). While the deed restrictions almost always refer to "building
setback lines" as those "shown on the appropriate recorded plat," the deed restrictions
never refer to "building setback lines" as those "contained in the Deed Restrictions." 
The deed restrictions simply call those "setbacks." 

 The most obvious explanation for the difference in terminology is that it
reflects the difference between the minimum building setback lines established by the
City of Houston, which are recorded on the properties' plats, and the setbacks
established by the deed restrictions. (11) Minimum building setback lines are established
by government authorities, such as the City of Houston, in order to mandate a
minimum distance that structures must be set back relative to a city street or for the
purposes of an easement. See Tex. Loc. Gov't Code Ann. § § 214.132-33 (Vernon 
 2008) (permitting governing body of municipality to establish building line on street
and prohibiting erection, re-erection, reconstruction, or substantial repair of structure
in area between street and building line); see also Houston, Tex., Code of
Ordinances, ch. 42, art. III,§ 42-150 (August 21, 1985) (setting minimum building
line requirements and prohibiting construction therein). In the City of Houston, these
building setback lines are required to be reflected on subdivision and development
plats, so the phrase "shown on the appropriate recorded plat" is implied when one
discusses a building setback line. See id. In the Code of Ordinances for the City of
Houston, this minimum distance is termed the "minimum building line" (emphasis
added), and deed restrictions may provide for "a greater building line or setback," but
not one that is less than the minimum standard required by the city. See id. ch. 42,
art. III, §§ 42-150, 42-152-42-161. Construction of improvements requiring building
permits within the "minimum building line" is prohibited. Id. ch. 42, art. III, § 42-150. Additionally, a person who fails to comply with the minimum setback building
lines set out on a recorded plat may be subject to civil penalties for violating a City
ordinance of up to $1000 per day which may be prosecuted by the city attorney either
as a suit to enforce a restriction or as an intervenor in a restriction suit. See id. ch. 10,
art. XV, §§ 10-551-53; see also Tex. Loc. Gov't Code Ann. §§ 212.151-53, -156;
-150 (Vernon 2008).

 The Uptegraphs assert that because sections of the restrictive covenants other
than section 9 do not use the word "minimum," a "minimum building setback line"
must be different than a "building setback line[] shown on the appropriate recorded
plat." The Uptegraphs adopt the following definition of "minimum": "the lowest
value in a set of more than one option." Using this definition, the Uptegraphs
explain, "In Sandalwood, any one side of a property will have no more than one
setback line, but there are multiple setback lines for the property as a whole. Thus,
the term 'minimum' has a readily ascertainable meaning when considered in light of
the multiple setbacks applicable to a lot--it means the smallest setback line for the
property." 

 We disagree. This definition would ignore the existence and controlling
authority of the City of Houston's ordinances providing for required specific
"minimum building [setback] lines" for improvements on a property relative to
particular streets and easements. Moreover, the "minimum" descriptor applied to
"building setback lines" in section 9 clearly is meant to reference the "minimum
building lines" required by the City of Houston relative to streets. The plain meaning
of "minimum building setback line" in the context of a street is the minimum distance
that a structure may be built from a particular street. (12) That is, if the minimum
building setback line relative to the street on the front of a lot is 25 feet, and that
setback line applies to fences, the owner may build a fence 26 feet from the street but
not 24 feet; 25 feet is the absolute minimum distance that the fence must be built from
the street.

 We conclude that the restrictive covenants in this case are not ambiguous.
Although the parties differ over the interpretation of the restrictions, they can be
given a definite and certain legal meaning. Air Park-Dallas Zoning Comm., 109
S.W.3d at 909. We hold that the term "minimum building setback lines" in section
9 of the Sandalwood deed restrictions means the setback lines depicted on the
recorded property plats that reflect the minimum building lines from particular streets
established by the City of Houston. Section 9 thus simply ensures that a fence or wall
will not be built nearer to a street than the minimum distance required by the
applicable City of Houston's building setback ordinance, by prohibiting it from being
nearer the street than the "minimum building setback line" reflected on the recorded
plat. (13) The evidence at trial established that the minimum building setback line for
the Uptegraphs' property along Sandalwood Drive was 25 feet. Accordingly, the trial
court did not err in so finding.

 We overrule the Uptegraphs' first issue.

Sufficiency of Evidence Regarding Presumption

 In their second amended answer to Sandalwood CC's petition, the Uptegraphs
contended that Sandalwood CC's rejection of the Sandalwood Drive fence was
arbitrary and capricious because, they contended, the Uptegraphs' change in the
orientation of the house to face Beechmont Road changed the setback line along
Sandalwood Drive. Alternatively, the Uptegraphs contended that Sandalwood CC
was abitrary and capricious in refusing to permit the construction of fences closer to
the street than the setback line. 

 The Uptegraphs also countersued Sandalwood CC: 

 (1) asserting that Sandalwood CC's insistence that the Sandalwood
Drive fence be removed was wrongful and seeking damages
against Sandalwood CC for the cost of removing the fence,
erecting a temporary barrier, and future costs of re-erecting the
fence;


 (2) asserting that Sandalwood CC breached a contract--the deed
restrictions--by attempting to enforce them in an arbitrary and
capricious manner and seeking recovery of attorney's fees; and


 (3) seeking a declaratory judgment that the Sandalwood Drive fence
was not subject to a setback line at all or was governed by a 10-foot setback line, alternatively asserting that Sandalwood CC's
refusal to grant them a "variance" for the Sandalwood Drive fence
was "arbitrary, capricious, and/or discriminatory," and requesting 
the award of attorney's fees. 




 The trial court entered various findings of fact and conclusions of law that
Sandalwood CC's decisions and actions were reasonable and not arbitrary, capricious,
or discriminatory. It also entered conclusions of law that the Uptegraphs were not
entitled to any relief or the recovery of any damages and denied the Uptegraphs any
relief or damages in its judgment.

 In their second issue on appeal, the Uptegraphs assert that "there is no evidence
to support the trial court's findings and conclusions (14) that Sandalwood CC acted reasonably in denying the Uptegraphs' fence," alternatively argue that the trial court's
findings are against the great weight and preponderance of the evidence, and, assert
that, consequently, the trial court's conclusions of law are erroneous as a matter of
law. The Uptegraphs also request this Court to render judgment in their favor. 

 However, the Uptegraphs do not challenge the trial court's conclusions of law
numbers 24 and 25 providing that the Uptegraphs are not entitled to recover any
damages and are not entitled to any relief, nor do they complain on appeal of the
portion of the trial court's judgment denying their counterclaim against Sandalwood
CC. Accordingly, we construe the Uptegraphs' arguments under this issue as a
challenge to the complained-of findings of fact and conclusions of law only as they
pertain to the Uptegraphs' defenses to Sandalwood CC's attempts to enforce the
restrictive covenants.

 The Uptegraphs argue that the evidence at trial showed that Sandalwood CC
acted arbitrarily, capriciously, and in a discriminatory manner by denying the
Uptegraphs' plans for the Sandalwood Drive fence and by "rejecting the authority"
it had to grant an exception under section 9 by deciding that it would not grant such
an exception without a "compelling reason," even though the deed restrictions did not
set out any particular standard for determining when to allow exceptions. Though not
clearly set out, the Uptegraphs also appear to challenge the sufficiency of the
evidence to support the trial court's findings and conclusions that Sandalwood CC did
not waive the right to enforce its restrictive covenants. 

A. Texas Property Code section 202.004(a)

 Section 202.004(a) of the Texas Property Code creates a presumption that a
property owners' association or other representative exercises its discretionary
authority concerning a restrictive covenant reasonably "unless the court determines
by a preponderance of the evidence that the exercise of discretionary authority was
arbitrary, capricious, or discriminatory." Tex. Prop. Code Ann. § 202.004(a)
(Vernon 2007). A presumption is simply a rule of procedure or an administrative
assumption that may be overcome when positive evidence to the contrary is
introduced. Green v. Ransor, Inc., 175 S.W.3d 513, 516 (Tex. App.--Fort Worth
2005, no pet.). Therefore a showing, by a preponderance of the evidence, that the
property owner's association exercised its discretionary authority concerning a
restrictive covenant in a way that was arbitrary, capricious, or discriminatory merely
destroys the presumption that the association acted reasonably. See Tex. Prop. Code
Ann. § 202.004(a). 


B. Standard of review

 Because Sandalwood CC was entitled to a presumption under section
202.004(a) that its exercise of its discretionary authority concerning the deed
restrictions was reasonable, it was the Uptegraphs' burden at trial to prove that
Sandalwood CC's exercise of its discretionary authority was arbitrary, capricious, or
discriminatory. See id. 

 We review sufficiency challenges to findings of fact under the same standards
that we use in reviewing the legal or factual sufficiency of the evidence supporting
jury findings. Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1993). 

 "When a party attacks the legal sufficiency of an adverse finding on an issue
on which she has the burden of proof, she must demonstrate on appeal that the
evidence establishes, as a matter of law, all vital facts in support of the issue." Dow
Chemical Co. v. Francis, 46 S.W.3d 237, 241 (Tex. 2001) (citing Sterner, 767
S.W.2d at 690). In reviewing the legal sufficiency of the trial court's finding, we
must "examine the record for evidence that supports the finding, while ignoring all
evidence to the contrary." Id. If there is no evidence supporting the finding of the
trial court, then we must "examine the entire record to determine if the contrary
proposition is established as a matter of law." Id. We will sustain the legal
sufficiency challenge "only if the contrary proposition is conclusively established." 
Id. (citing Croucher v. Croucher, 660 S.W.2d 55, 58 (Tex. 1983)).

 "When a party attacks the factual sufficiency of an adverse finding on an issue
on which she has the burden of proof, she must demonstrate on appeal that the
adverse finding is against the great weight and preponderance of the evidence." Id.
at 242. We must "consider and weigh all of the evidence," and we "can set aside a
verdict only if the evidence is so weak or if the finding is so against the great weight
and preponderance of the evidence that it is clearly wrong and unjust." Id.

 We review a trial court's conclusions of law under a de novo standard. BMC
Software Belg. v. Marchand, 83 S.W.3d 789, 794 (Tex. 2002). An appellant may not
challenge a trial court's conclusion of law for factual insufficiency, but the reviewing
court may review the trial court's legal conclusions drawn from the facts to determine
their correctness. Id. We will uphold a trial court's conclusion of law on appeal if the
judgment can be sustained on any legal theory supported by the evidence. Keith v.
Keith, 221 S.W.3d 156, 167-68 (Tex. App.--Houston [1st Dist.] 2006, no pet.); see
also Marchand, 83 S.W.3d at 794 (holding that if reviewing court determines
conclusion of law erroneous, but trial court rendered proper judgment, erroneous
conclusion does not require reversal). "An incorrect finding of fact or conclusion of
law does not warrant a reversal if the judgment is otherwise correct." Loera v.
Interstate Invest. Corp., 93 S.W.3d 224, 229 (Tex. App.--Houston [14th Dist.] 2002,
pet. denied); Vaughn v. DAP Financial Servs., 982 S.W.2d 1, 6 (Tex. App.--Houston
[1st Dist.] 1997, no pet.).

C. Denial of plans to build Sandalwood Drive fence

 To the extent that the Uptegraphs challenge the trial court's findings of fact and
conclusions of law that Sandalwood CC acted reasonably in rejecting the Uptegraph's
plans to build a fence (15) closer than 25 feet to Sandalwood Drive and that Sandalwood
CC properly construed the deed restrictions to prohibit a fence closer than 25 feet to
Sandalwood Drive (finding of fact number 35 and conclusion of law number 7), we
overrule this contention. As we have already held, 25 feet was the minimum setback
line under the deed restrictions applicable to the fence on Sandalwood Drive. The
evidence at trial supports the trial court's findings and conclusions that Sandalwood
CC properly construed the deed restrictions to require a 25-foot setback from
Sandalwood Drive and acted reasonably in rejecting plans for a fence to be
constructed in violation of the deed restrictions. Accordingly, the Uptegraphs have
not met their burden to establish, as a matter of law, all vital facts in support of the
issue, nor have they shown that this adverse finding is against the great weight and
preponderance of the evidence. The Uptegraphs also failed to meet their burden of
proof to show that Sandalwood CC's exercise of its discretionary authority in
construing the deed restrictions to require a 25-foot setback from Sandalwood Drive
and rejecting the Uptegraphs plans for a fence less than 25 feet from Sandalwood
Drive was arbitrary, capricious, or discriminatory. We overrule the Uptegraphs'
challenges to the trial court's findings of fact number 35 and conclusion of law
number 7.

D. Denial of an exception and waiver

 To the extent that the Uptegraphs challenge the trial court's findings and
conclusions regarding Sandalwood CC's decision not to grant the Uptegraphs an
exception to the deed restrictions that would permit them to build a fence less than
25 feet from Sandalwood Drive, we likewise find that the Uptegraphs did not meet
their burden to establish, as a matter of law, all vital facts in support of this issue, nor
have they shown that this adverse finding is against the great weight and
preponderance of the evidence. The Uptegraphs also did not meet their burden to
prove that Sandalwood CC's exercise of its discretionary authority in declining to
grant the Uptegraphs an exception to the deed restrictions was arbitrary, capricious,
or discriminatory. It was not arbitrary, capricious, or discriminatory for Sandalwood
CC to adopt standards for deciding whether to grant a request for an exception under
section 9 and the adoption of a "compelling reason" standard is not arbitrary,
capricious, or discriminatory. The fact that two other houses in the subdivision had
fences closer to a street than the minimum setback line does not establish that
Sandalwood CC's decision to deny the Uptegraphs's request was arbitrary,
capricious, or discriminatory.

 Nor does it establish waiver on the part of Sandalwood CC. When lot owners
acquiesce in substantial violations within a restricted area, said acquiescence can
amount to an abandonment of the covenant or a waiver of the right to enforce it. 
Cowling v. Colligan, 312 S.W.2d 943, 945 (Tex. 1958). To establish abandonment,
a party must prove that the violations are so great as to lead the mind of the average
man to reasonably conclude that the restriction in question has been abandoned. Id.
at 945-46. In making this determination, we consider "'the number, nature, and
severity of the then existing violations, any prior acts of enforcement of the
restriction, and whether it is still possible to realize to a substantial degree the
benefits intended through the covenant.'" Tanglewood Home Assoc., Inc. v. Henke,
728 S.W.2d 39, 43-44 (Tex. App.--Houston [1st Dist.] 1987, writ ref'd n.r.e.)
(quoting New Jerusalem Baptist Church, Inc. v. City of Houston, 598 S.W.2d 666,
669 (Tex. Civ. App.--Houston [14th Dist.] 1980, no writ.)). 

 At trial, the Uptegraphs presented evidence that two other homes had fences
that violated the Sandalwood deed restrictions by being closer to a street the building
setback lines. Sandalwood CC presented the testimony of Robert Schick, a
Sandalwood subdivision resident since 1994 and president of Sandalwood CC at the
time of the trial, and Phillip Ewald, a Sandalwood subdivision resident since 1989
and member of the ACC since approximately 1991. Schick and Ewald testified that
the Schroeder fence was closer to the street than the applicable setback line. 
However, testimony also established that the fence was built prior to 1989, so as a
pre-existing violation, the fence was grandfathered by the 1990 deed restrictions. 
Testimony also established that the ACC could not have shown favoritism to Mr.
Schroeder, a member of the ACC at the time of the trial, because the Schroeder fence
existed decades before Schroeder acquired the property. The ACC did not become
aware that the Schroeder fence was built outside the applicable setback line until a
month before trial.

 The second violation, the Marsh fence, was also grandfathered by the 1990
deed restrictions. Schick and Ewald explained that the ACC approved the addition
of an ornamental gate and a small length of fence to connect the grandfathered fence
to the Marsh garage. Though the gate and additional fence were built closer to the
street than applicable setback lines, the ACC approved the addition so that Mr. Marsh
could enclose his property for security purposes. Marsh was a member of the Board
at the time of this addition, but testimony demonstrated that Marsh was not shown
favoritism by the ACC, which rejected Marsh's original plans and required
amendments before approval. 

 Additionally, two setback violations in a subdivision containing approximately
180 houses is insufficient to establish abandonment, even if the two offending fences
had not been grandfathered. If the two fences were actual violations and not
grandfathered violations, the Sandalwood subdivision violation rate would be
approximately 1.11%. "Texas courts have found that violation rates ranging from
1.9% to 8.9% were not sufficient to support waiver and abandonment . . . ." City of
Houston v. Revels, No. 14-99-00139-CV, 2001 WL 699546, at *2 (Tex.
App.--Houston [14th Dist.] June 21, 2001, pet. denied) (not designated for
publication); see also Sherer, 2 S.W.3d at 290-91; Dempsey v. Apache Shores Prop.
Owners' Ass'n, 737 S.W.2d 589, 595 (Tex. App.--Austin 1987, no writ); Henke, 728
S.W.2d at 44; New Jerusalem Baptist Church, 598 S.W.2d at 669; Underwood v.
Webb, 544 S.W.2d 187, 190 (Tex. Civ. App.--Waco 1976, writ ref'd n.r.e.); Garden
Oaks Bd. of Tr. v. Gibbs, 489 S.W.2d 133, 134 (Tex. Civ. App.--Houston [1st Dist.]
1972, writ ref'd n.r.e.). 

 We conclude that the Uptegraphs have not meet the burdens applicable to their
challenges of the trial court's findings of fact and conclusions of law. We overrule
their challenges to findings of fact numbers 36, 37, 38, and 39 and conclusions of law
numbers 9, 10, and 13. 

 We overrule the Uptegraphs' second issue. Damages under Texas Property Code Section 202.004(c)

 In their third issue, the Uptegraphs assert that the trial court erred in assessing
$20,000 in civil damages under Texas Property Code section 202.004(c) because the
damages were "unsupported by the evidence, against the great weight of the evidence,
manifestly unjust, and erroneous as a matter of law." See Tex. Prop. Code Ann.
§ 202.004(c) (Vernon 2007). The Uptegraphs cite to the trial court's findings of facts
numbers 41 and 42 and conclusion of law number 20. (16) 

 The Uptegraphs' challenge to the trial court's assessment of damages under
section 202.004(c) is predicated on their assertion that a trial court may not assess
damages under that statute unless there is evidence in the record that a violation of
a restrictive covenant resulted in actual harm or injury for which compensation may
be recovered. Essentially, the Uptegraphs argue that the evidence is legally and
factually insufficient to support any damages because there was no--or insufficient--
evidence of actual damages. We therefore first determine whether the damages that
may be assessed by a trial court under section 202.004(c) are limited to compensation
for actual injury or harm shown to have resulted from the violation of a restrictive
covenant.

 Section 202.004 of the Texas Property Code provides in pertinent part:

(b) A property owners' association or other representative designated
by an owner of real property may initiate, defend, or intervene in
litigation or an administrative proceeding affecting the
enforcement of a restrictive covenant or the protection,
preservation, or operation of the property covered by the
dedicatory instrument.


(c) A court may assess civil damages for the violation of a restrictive
covenant in an amount not to exceed $200 for each day of the
violation. 


Tex. Prop. Code Ann. § 202.004(b),(c) (Vernon 2007). 

 The damages awarded under subsection (c) of the statute are clearly
discretionary with the court, and the language of section 202.004(c) suggests that the
damages that may be assessed thereunder are punitive, rather than compensatory, in
nature. (17) See id.§ 202.004(c); Air Park-Dallas Zoning Comm., 109 S.W.3d at 912
(holding that damages under section 202.004(c) discretionary with court and
reviewing trial court's decision not to assess any damages under abuse of discretion
standard). A statutory designation of a sum as "damages" does not govern its
character and does not prevent it from being penal in nature. See Johnson v. Rolls,
97 Tex. 453, 79 S.W. 513, 514 (1904). Merely placing a label of "damages" on a
statutory provision does not change its underlying character. See Flores v.
Millennium Interests, Ltd., 185 S.W.3d 427, 433 (Tex. 2005). When a statute
provided for an award of "liquidated damages" for a violation "without regard to the
character of the act, or its effect on the rights of the 'person aggrieved,'" and there
was "nothing in the law to indicate that there was any purpose to compensate the
'person aggrieved,'" the Texas Supreme Court held that such "damages" were
intended as a punishment for the violation, regardless of whether the sum to be
recovered was called a damage or a penalty. See Johnson, 79 S.W. at 514. The
Texas Supreme Court has likewise construed a provision in the Texas Property Code
that provides for "liquidated damages" of $250 per day as being penal in nature,
despite the use of the term "damages," noting that the award obviously bore no
relation to the harm caused, if any harm was caused at all. Flores, 185 S.W.3d at
429, 433. The supreme court further held that nothing in the statute required proof
of actual harm or injury for the recovery of the statutory damages, and to require
proof of actual damages as a predicate to recovery was inconsistent with the
conclusion that the damages provision was punitive rather than compensatory. Id. at
434. Recently, the Dallas Court of Appeals came to a similar conclusion involving
a statutory award for violations of certain provisions of the Texas Financial Code,
holding that a statute that provided an award of "not less than $100 for each
violation" did not require proof of actual damages because nothing in the statute
required a person to prove actual harm or injury to recover such statutory damages. 
See Marauder Corp. v. Bell, No. 05-08-00713-CV, 2009 WL 4199329, at *4,(Tex.
App.--Dallas November 25, 2009, no pet. hist.).

 Notably, the amount of damages that may be assessed under section 202.004(c)
is not related to the showing of any type of injury or harm or the extent of such injury
or harm; rather, it is related to the number of days that the violation takes place,
without any reference to the nature, extent, or existence of any type of injury or harm. 
See Tex. Prop. Code Ann. § 202.004(c). Nothing in section 202.004 indicates that
the "damages" that the trial court may "assess" under subsection (c) are intended to
be compensation for any actual harm or injury from the violation of the restrictive
covenant. Finally, nothing in section 202.004 limits the trial court's assessment of
"damages" under subsection (c) to compensation for actual harm or injury suffered
as a result of the violation. See id. § 202.004.

 In Dickerson v. Barbieris, our sister court of appeals noted that section
202.004(c) does not require that the damages assessed under that section correspond
to damages actually suffered as a result of the violation of the restrictive covenant. 
See Dickerson v. Barbieris, 964 S.W.2d 680, 689-90 (Tex. App.--Houston [14th
Dist.] 1998, no pet.). We agree and hold that the damages that may be assessed under
section 202.004(c) are not limited to compensation for actual harm or injury from the
violation of a restrictive covenant. Because there is no relation between the statutory
damages that may be assessed under section 202.004(c) and any actual harm or injury
from the violation, a trial court does not abuse its discretion in assessing damages
under section 202.004(c) in the absence of evidence of actual damages.

 We therefore reject the Uptegraphs' complaint that the trial court erred by
assessing damages under section 202.004(c) in the absence of any--or
sufficient--evidence of actual damages. Because we have held that evidence of
actual damages is not a prerequisite to the assessment of damages under section
202.004(c), we likewise overrule the Uptegraphs' contentions that finding of fact 42
and conclusion of law number 20 were erroneous because there was no evidence, or
insufficient evidence, of actual damages. We overrule the Uptegraphs' challenge to
finding of fact 41, because the record supports the trial court's finding, but note that
the section 202.004(c) does not require proof of any mens rea in the commission of
a violation of a restrictive covenant before a trial court may assess damages; the
statute merely requires a violation to have occurred. See Tex. Prop. Code Ann.
§ 202.004(c).

 We overrule the Uptegraphs' third issue.

 Conclusion

 We affirm the judgment of the trial court.

 

 



 Tim Taft

 Justice

 

 

Panel consists of Chief Justice Radack and Justices Sharp and Taft. (21) 






 
1. Tex. Prop. Code Ann. 202.004(c) (Vernon 2007).
2. Although several members of the Board had been absent, more than a quorum
of the Board had been present for the hearing and vote on the Uptegraphs'
appeal. 
3. Reynolds testified at trial that the ACC did not have the authority to approve
a 10-foot high fence; a fence of that height required approval from the City of
Houston.
4. See Dyegard Land P'ship v. Hoover, 39 S.W.3d 300, 309 (Tex. App.--Fort
Worth 2001, no pet.); see also Hebert v. Polly Ranch Homeowners Ass'n, 943
S.W.2d 906, 908 n.2 (Tex. App.--Houston [1st Dist.] 1996, no writ) ("Even
after the enactment of section 202.003, this Court stated that covenants
restricting the free use of land were not favored. It is not necessary for us to
resolve such discrepancies today because under either approach we would
reach the same result . . . ."). 
5. See Village of Pheasant Run Homeowners Ass'n, Inc. v. Kastor, 47 S.W.3d
747, 750-51 (Tex. App.--Houston [14th Dist.] 2001, pet. denied); Bernard v.
Humble, 990 S.W.2d 929, 930-31 (Tex. App.--Beaumont 1999, pet. denied);
Candlelight Hills Civic Ass'n v. Goodwin, 763 S.W.2d 474, 476, 477, 480
(Tex. App.--Houston [14th Dist.] 1988, writ denied); see also Highlands Mgt.
Co. v. First Interstate Bank of Tex., N.A., 956 S.W.2d 749, 752 (Tex.
App.--Houston [14th Dist.] 1997, pet. denied) (citing holding of Goodwin, but
noting that Highlands court did not disagree with Wilmoth's statement of the
strict-construction rule); Hebert v. Polly Ranch Homeowners Ass'n, 943
S.W.2d 906, 913 (Tex. App.--Houston [1st Dist.] 1996, no writ) (Wilson, J.,
dissenting on denial of rehearing).
6. See Reagan Nat'l Advertising of Austin, Inc. v. Capital Outdoors, Inc., 96
S.W.3d 490, 493 n.2 (Tex. App.--Austin 2002, pet. granted, judg'mt vacated
w.r.m.); Dyegard, 39 S.W.3d at 309; Simon Prop. Gr. (Tex.) L.P. v. May Dep't
Stores Co., 943 S.W.2d 64, 71 (Tex. App.--Corpus Christi 1997, no writ);
Ashcreek Homeowner's Ass'n v. Smith, 902 S.W.2d 586, 588-89 (Tex.
App.--Houston [1st Dist.] 1995, no writ); Crispin v. Paragon Homes, Inc., 888
S.W.2d 78, 81 & 81 n.1 (Tex. App.--Houston [1st Dist.] 1994, writ denied);
see also Highlands Mgt. Co., 956 S.W.2d at 752 (citing section 202.003(a)'s
liberal-construction rule, but then noting that Highlands court did not disagree
with Wilmoth's statement of the strict-construction rule).
7. See Reagan Nat'l Advertising, 96 S.W.3d at 493 & 493 n.2; Dyegard, 39
S.W.3d at 309; Simon Prop. Gr., 943 S.W.2d at 71; Crispin, 888 S.W.2d at 81.
8. See Quinn v. Harris, No.1999 WL 125470 at *2 n.3 (Tex. App.--Austin Mar.
11, 1999, pet. denied) (not designated for publication) ("The Fourth Court of
Appeals has employed both [section 202.003(a)'s liberal and the common
law's strict] standards to review a restrictive covenant, finding that the
covenant should be liberally construed to determine the framers' intent, and if
there is any ambiguity as to that intent, the covenant should then be strictly
construed in favor of the free and unrestricted use of the premises. . . .We
believe the Fourth Court of Appeals has found the proper balance between the
two standards that does not conflict with precedent or the Texas Property
Code.") (citation omitted); see also Pitman v. Lightfoot, 937 S.W.2d 496, 517
(Tex. App.--San Antonio 1996, writ denied) (holding that contract is
unambiguous as matter of law if, after appropriate rules of construction have
been applied, it can be given definite or certain legal meaning).
9. See Pebble Beach Prop. Owners' Ass'n v. Sherer, 2 S.W.3d 283, 288 (Tex.
App.--San Antonio 1999, pet. denied)
10. See Truong v. City of Houston, 99 S.W.3d 204, 214 (Tex. App.--Houston [1st
Dist.] 2002, no pet.); Am. Golf Corp. v. Colburn, 65 S.W.3d 277, 280 (Tex.
App.--Houston [14th Dist.] 2001, pet. denied); Samms v. Autumn Run
Community Improvement Ass'n, Inc., 23 S.W.3d 389, 402 (Tex.
App.--Houston [1st Dist.] 2000, pet. denied); Bank United v. Greenway
Improvement Ass'n, 6 S.W.3d 705, 708 (Tex. App.--Houston [1st Dist.] 1999,
pet. denied); Boudreaux Civic Ass'n v. Cox, 882 S.W.2d 543, 547 (Tex.
App.--Houston [1st Dist.] 1994, no writ); Gettysburg Homeowners Ass'n v.
Olson, 768 S.W.2d 369, 372 (Tex. App.--Houston [14th Dist.] 1989, no writ);
see also Hebert, 943 S.W.2d at 907-08 & 908 n.2 (citing 202.003(a)'s
construction standard and declining to resolve any conflict between that
section's construction standard and that of common law). Still other courts
have referred to both standards together without discussing whether the
standards do or do not conflict. See Air Park-Dallas Zoning Comm. v. Crow
Billingsley Airpark, Ltd., 109 S.W.3d 900, 909 (Tex. App.--Dallas 2003, no
pet.); see also Hodas v. Scenic Oaks Prop. Ass'n, 21 S.W.3d 524, 528 (Tex.
App.--San Antonio 2000, pet. denied) (noting that section 202.003(a)'s
construction standard applies to determine intent and that strict-construction
rule applies if covenant ambiguous).
11. We note also that the deed restrictions contain words, not pictures. While the
deed restrictions contain setback distances, they do not contain setback lines. 
The recorded plats, however, are pictorial, so they do contain actual building
setback lines. 
12. Other courts have operated under a similar understanding of this term. See
City of Austin v. Hyde Park Baptist Church, 152 S.W.3d 162, 167 (Tex.
App.--Austin 2004, no pet.); Texans to Save Capitol, Inc. v. Board of
Adjustment of the City of Austin, 647 S.W.2d 773, 776 (Tex. App.--Austin
1983, writ ref'd n.r.e.); Martin v. Moore, 562 S.W.2d 274, 277, 279 (Tex. Civ.
App.--Austin 1978, no writ.).
13. Section 9 also provides that the ACC may approve a fence or wall closer to the
street than the minimum building setback distance. That portion of section 9,
if exercised, would appear to place the homeowner in violation of the
applicable City minimum building line ordinance, notwithstanding any
approval on the part of the ACC, when the fence or wall is one which requires
a building permit. See Houston, Tex., Code of Ordinances, ch. 42, art. III, 
§ 42-150 (1985) (prohibiting construction of improvement requiring building
permit within minimum building line requirement established by article).
14. The Uptegraphs cite to the following findings of facts:


35. The decisions and actions of Plaintiff in rejecting the plans for the
fence along Sandalwood Drive and along Beechmont, and
Plaintiff's interpretation of its restrictive covenants, were
reasonable and were not arbitrary, capricious, or discriminatory.


36. No compelling reason was shown to require Plaintiff to allow the
said fence to be built closer to the street along Sandalwood Drive
than the 25 foot setback line.


37. There was no showing of any knowing, voluntary, intentional
approval or acquiescence in any other fence within any section of
Sandalwood being built or maintained closer to the street than the
applicable setback line.


38. Plaintiff did not know of any other fences within Sandalwood
being closer to the street than the setback line prior to the filing
of this suit.


39. Only two other fences within Sandalwood, out of approximately
180 lots, were shown to be closer to the street than the setback
line. This does not amount to a sufficient number of violations to
constitute waiver or abandonment of the restrictive covenants.


and conclusions of law:


 7. The actions of the ACC and Plaintiff in rejecting the plans for the
fence along Sandalwood Drive as constructed, and Plaintiff's
interpretation of its restrictive covenants, are presumed
reasonable under Texas Property Code 202.004, and are found to
have been reasonable, and were not arbitrary, capricious, or
discriminatory.


 8. The actions of the ACC and Plaintiff in rejecting the plans for the
Beechmont fence, and Plaintiff's interpretation of its restrictive
covenants, are presumed reasonable under Texas Prop. Code
§ 202.004, and are found to have been reasonable, and were not
arbitrary, capricious, or discriminatory.


 9. Plaintiff has not waived nor abandoned the restrictive covenants.


 10. Plaintiff has been diligent in enforcing its restrictive covenants.


 13. Plaintiff is not barred from bringing this action by any theory of
estoppel.
15. In this issue, the Uptegraphs make repeated references to "the Uptegraphs'
fence" but do not specify whether they are referring to the Sandalwood Drive
fence or the Beechmont Road fence. One of the findings and conclusions that
they challenge refers to both fences and one (conclusion of law number 8) only
references the Beechmont Road fence. Based on our reading of the
Uptegraphs' issue and the setback lines and claims regarding waiver discussed,
we conclude that the Uptegraphs are only challenging the trial court's findings
and conclusions applicable to Sandalwood CC's actions relative to the
Sandalwood Drive fence. We discern no argument pertaining to the rejection
of the plans for the Beechmont Road fence and so deem any attempted
challenge to conclusion of law 8 to be inadequately briefed and do not address
it. See Tex. R. App. P. 38.1(i); Howeth Inves., Inc. v. City of Hedwig Vill., 259
S.W.3d 877, 902 (Tex. App.--Houston [1st Dist.] 2008, pet. denied). We note,
however, that Sandalwood CC presented evidence at trial that plans for the
proposed 10-foot high Beechmont fence were rejected because only the City
could authorize the building of a fence of that height.
16. The challenged findings and conclusion are:


 41. Defendants knowingly, intentionally and deliberately disregarded
the restrictive covenants in constructing the fence in issue.


 42. Reasonable civil damages for Plaintiff in accordance with Texas
Prop. Code § 202.004 are $20,000.00.


 20. Plaintiff is entitled to recover civil damages found above from
Defendants pursuant to Texas Prop. Code § 202.004.
17. For example, section 202.004(c) (18)
18. 

 states that a court may "assess damages," rather than stating that
a particular party is "allowed" (19)
19. Cf. Tex. Prop. Code Ann. § 5.006 (Vernon 2007) " "
"" 
 permits a trial court discretion to "assess damages" rather than to
"award damages"; 


 


 provides for an assessing of damages "for the violation," rather
than for damages "resulting from" (20)
20. Cf. Tex. Prop. Code Ann. § 21.044 (Vernon 2007) (providing damages from
temporary possession, stating that court may "award to the property owner the
damages that resulted from the temporary possession.") " 
" 


 


 provides for the assessment of damages on a per diem basis,
relating the damages assessed to the number of days that the
restrictive covenant is violated.



See Tex. Prop. Code Ann. § 202.004(c). 
21. Justice Tim Taft, who retired from the First Court of Appeals effective June 1,
2009, continues to sit by assignment for the disposition of this case, which was
submitted on May 26, 2009.